Aaron D. Shipley (Nevada Bar No. 8258)
Rory T. Kay (Nevada Bar No. 12416)
McDONALD CARANO LLP
2300 West Sahara Avenue Suite 1200
Las Vegas, NV 89102
Telephone: (702) 873-4100
Facsimile: (702) 873-9966
E-mail: ashipley@mcdonaldcarano.com

Louis T. Perry, Esq. (*admitted pro hac vice*)
FAEGRE DRINKER BIDDLE & REATH
300 North Meridian Street, Suite 2500
Indianapolis, IN 46204
Telephone: (317) 237-1089
E-mail: louis.perry@faegredrinker.com
*Attorneys for Defendant Prologis, L.P.*

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

| | |
|---|---|
| INTERIOR ELECTRIC INCORPORATED NEVADA, a domestic corporation. | Case No. 2-18-CV-01118-JAD-MDC |
| Plaintiff, | |
| v. | **PROLOGIS, L.P.'S MOTION FOR SUMMARY JUDGMENT** |
| T.W.C. CONSTRUCTION, INC., a Nevada corporation; TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, a Connecticut corporation; MATTHEW RYBA, an individual; GUSTAVO BAQUERIZO, an individual; CLIFFORD ANDERSON, an individual; POWER UP ELECTRIC COMPANY, a Nevada limited liability company; PROLOGIS, L.P., a Delaware limited partnership; AML PROPERTIES, INC., a Nevada corporation; AML DEVELOPMENT 3, LLC, a Nevada limited liability corporation; LAPOUR PARTNERS, INC., a Nevada Corporation; DON FISHER, an individual; PHILCOR T.V. & ELECTRONIC LEASING, INC., a Nevada corporation, dba NEDCO; QED, INC., a Nevada corporation; TURTLE & HUGHES, Inc., a New Jersey corporation; DOES I-X, inclusive; and ROE CORPORATIONS I-X, inclusive, | |
| Defendants. | |

FAEGRE DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW
WASHINGTON

T.W.C. CONSTRUCTION, INC., a Nevada corporation

Counterclaimant,

v.

INTERIOR ELECTRIC INCORPORATED NEVADA, a domestic corporation; INTERIOR ELECTRIC, INC, a California corporation; DOES I-X, inclusive; and ROE CORPORATIONS I-X, inclusive,

Counterdefendants.

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendant Prologis, L.P. ("Prologis"), by and through its undersigned counsel, respectfully moves for summary judgment on Plaintiff Interior Electric Incorporated Nevada's ("IE") claims for contributory and vicarious copyright infringement (Counts Six and Seven), unjust enrichment (Count Thirteen), Civil Conspiracy (Count Twenty), and Aiding and Abetting (Count Twenty-One). This Motion is based on the papers and pleadings on file herein, the following Memorandum of Points and Authorities, which includes a Statement of Undisputed Material Facts, the exhibits attached hereto, and any oral argument that the Court may entertain in this matter.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.       INTRODUCTION

IE filed this lawsuit against T.W.C. Construction, Inc. ("TWC"), Prologis, and a host of other defendants asserting dozens of claims, each arising out of the same basic set of facts: (1) Prologis hired TWC as its general contractor in connection with certain development projects in the Nevada area; (2) TWC engaged IE as its electrical subcontractor for these projects, but then terminated that relationship after allegedly soliciting two of IE's employees to leave IE; and (3) TWC completed the projects using a different subcontractor. Seven years of motions practice and discovery have revealed what should have been obvious from the outset: this dispute is between IE and TWC.  IE does not have a single piece of testimony or evidence to support any of the claims it

asserted against Prologis, and the Court should grant summary judgment in Prologis's favor.

Starting with IE's copyright claims, the undisputed evidence in the record establishes that Prologis cannot be liable for contributory or vicarious copyright infringement. Even if IE had standing to assert these claims (and for reasons discussed herein, that assumption is dubious), the undisputed evidence in the record establishes that Prologis had no knowledge of any alleged copyright infringement, no reason to know of the alleged infringement, took no affirmative steps to induce any such infringement, and did not directly profit from the infringement. To the contrary, and consistent with its contractual agreement with TWC and the parties' historical course of dealing, Prologis delegated responsibility for hiring, supervising, and addressing issues with subcontractors to TWC. Prologis was not involved in the day-to-day operations and interactions with subcontractors. When TWC informed Prologis that it was no longer working with IE, Prologis relied on TWC to address any issues that might arise from that decision and move current projects forward on the scheduled timeline. Prologis did not suspect, and had no reason to suspect, that TWC would use IE's allegedly copyrighted plans to complete any projects and certainly did not direct or otherwise induce TWC to do so. To the extent any benefit was derived from TWC's alleged use of the copyrighted plans, there is no evidence in the record to suggest that any such benefit flowed to Prologis or otherwise influenced any profits Prologis ultimately obtained from leasing the developments. On these undisputed facts, no reasonable jury could find that Prologis was liable for contributory or vicarious copyright infringement, or that IE is entitled to Prologis's profits, if any, as a matter of law.

As to IE's state law claims for unjust enrichment, civil conspiracy, and aiding and abetting, these claims fail as a matter of law because each is preempted by the copyright act. Accordingly, IE has no viable claims against Prologis, and the Court should grant summary judgment.

## II.     STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.     The Relationship Between Prologis and TWC

1.     Prologis is a real estate company that, among other things, owns, develops, and leases commercial distribution centers in the Las Vegas area. *See* Deposition Transcript of John Low ("Low Depo."), relevant portions of which are attached hereto as **Exhibit 1,** at 20:13-22

FAEGRE DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW

3

(APEN0004).

2.      Blake Kelley, Fritz Wyler, and John Low were each employed by Prologis and were involved in Prologis projects in Nevada during the relevant time period.  Low Depo. 12:2-23 (APEN0003); Deposition Transcript of Blake Kelley ("Kelley Depo."), relevant portions of which are attached hereto as **Exhibit 2**, at 19:12-20:3 (APEN0024-25); Transcript Deposition Transcript of Fritz Wyler ("Wyler Depo."), relevant portions of which are attached hereto as **Exhibit 3**, at 14:9-12 (APEN0045).

3.      Most of the properties Prologis developed in Nevada were speculative in nature, meaning that Prologis purchased and developed a vacant property without first having a specified user or tenant.  Low Depo. 71:21-72:6 (APEN0018-19).

4.      Prologis would develop these properties to meet the general requirements of a distribution warehouse or e-commerce center, which involved straightforward design with respect to architecture and engineering.  Low Depo. 71:21-73:9 (APEN0018-20)

5.      Less commonly, Prologis developed properties built-to-suit, meaning that Prologis had a tenant for the property and would build the property out for a tenant's specific needs. Low Depo. 71:21-73:9.

6.      Once Prologis identified a tenant for a project, Prologis and the tenant would enter into a lease agreement, which was typically signed before construction on the project was completed. Low Depo. 22:13-23 (APEN0005).

7.      Prologis has a long-standing relationship with TWC, and TWC served as the general contractor on several of Prologis's projects and properties. Kelley Depo. 29:4-18 (APEN0026); *see also* Low Depo. 36:13-16 (APEN0006) .

8.      Prologis contracted with TWC as the general contractor on the eight specific projects listed in IE's complaint: the Nexgistics Project; the LVCC 12 TI (Muscle and Strength) Project; the Longview Fiber Project; the Astound TI Project; the Dr. Pepper Bottling Project; the VMI TI at

Prologis Speedway II Project; and the LVCC 9 TI (Tantara) project (the "Subject Properties").[1] *See* Second Amended Complaint (Doc. 188) ¶ 285.

9. Prologis considered TWC to be one of its "top-performing general contractors." Kelley Depo. 51:22-52:5 (APEN0028-29).

10. The contractual agreements between Prologis and TWC provided that "Contractor [TWC] shall be solely responsible for and have control over construction means methods, techniques, sequences and procedures and for coordinating all portions of the Work under the Contract." *See* Agreement Between Owner and Contractor Section 3.3.1 ("Agreement") attached hereto as **Exhibit 5** (APEN0077).[2]

11. Additionally, the Agreement specified that TWC was responsible for identifying and selecting subcontractors. Ex. 5 Section 5 (APEN0103-104).

12. Prologis was not involved in the selection of subcontractors; instead, TWC "would submit who they felt was the best qualified for the specific project." Low Depo. 36:17-21 (APEN0006).

13. After selecting the subcontractors, the parties' contract required TWC to "furnish in writing to the Owner [Prologis] through the Architect the names of persons or entities . . . proposed for each principal portion of the Work." Ex. 5 Section 5.2.1 (APEN0103).

14. Prologis and/or the architect could make a reasonable and timely objection to any proposed subcontractor, and TWC would then propose another subcontractor. Ex. 5 Section 5.2.1 (APEN0103).

15. Prologis rarely objected to a subcontractor selected by TWC and reserved such objections for situations in which Prologis had concerns as to whether the subcontractor was

---

[1] During discovery, IE sought documents identifying all gross revenues that Prologis ever received in connection with the Subject Properties and several additional properties for which TWC was contracted as the general contractor (the "Additional Properties") that were never identified in the Second Amended Complaint. *See* Interior Electric Incorporated Nevada's First Set of Requests for Production of Documents to Prologis, L.P., at pages 4-8 (defining Copyrighted Plan Projects and Copyrighted Template Projects), a copy of which is attached hereto as **Exhibit 4** (APEN0064-68).

[2] Exhibit 5 is a representative agreement between TWC and Prologis regarding one of the Subject Properties, and the relevant terms of this agreement are uniform in all of Prologis's agreements with TWC.

qualified or had the financial wherewithal to complete the project. Low Depo. 39:4-40:8 (APEN0007-8).

16.    TWC was not required to contract with anyone to whom TWC had a reasonable objection. Ex. 5 Section 5.2.2(APEN0103) .

17.    The contract also prohibited TWC from changing subcontractors if Prologis or the architect made a reasonable objection to the change. Ex. 5 Section 5.2.4 (APEN0103).

18.    However, TWC was not required to notify Prologis if it changed subcontractors during the course of a project. *See generally* Ex. 5 Section 5(APEN0103-104) .

19.    The contract also provided that TWC would pay liquidated damages if it failed to adhere to the substantial completion deadline set forth in the contract. Ex. 5 at Exhibit E to Attachment 3 (APEN0144).

**B.**    **The Relationship Between Prologis, TWC, and IE**

20.    Once Prologis and TWC agreed on building or tenant improvement specifications, TWC would price the project with its key subcontractors based on competitive bids. Wyler Depo. at 27:7-22 (APEN0046).

21.    On the Subject Properties at issue in this litigation, TWC hired IE as the electrical subcontractor. Doc. 188 at ¶ 286.

22.    IE is not tied to the contract between Prologis and TWC. Deposition Transcript of Mark Beverly ("M. Beverly Depo."), relevant portions of which are attached hereto as **Exhibit 6**, at 253:3-8 (APEN0151).

23.    Prologis did not communicate directly with subcontractors. Kelley Depo. 32:14-16 (APEN0027) ("Q. Sure. Did you ever communicate directly with subcontractors? A. No."); Low Depo. 49:4-7 (APEN0013) (testifying that Prologis never communicated directly with IE).

24.    Prologis was not responsible for reviewing technical plans provided by subcontractors. Low Depo. 62:4-12 (APEN0014) (testifying that Low never recalled seeing a plan with IE's name on it); *id*. at 43:9-25 (APEN0010) (testifying that the architect or general contractor, not Prologis, was responsible for closely scrutinizing mechanical, electrical, and plumbing plans and submitting plans to the city); Wyler Depo. 91:15-22 (APEN0056) (testifying he "wouldn't be

looking at the sub trade drawings or [sic] at all or frankly paying attention to who is stamping it necessarily"); *id*. at 91:23-92:6 (APEN0056-57) (testifying he would not know the author of the plans).

25.    IE did not communicate directly with Prologis. M. Beverly Depo. 254:25-255:2 (APEN0152-153) ("There's a protocol: Owner talks to GC, GC instructs subcontractors. That's the way it goes. You don't jump around somebody").

26.    Prologis's overall interactions with subcontractors, including IE, was limited.  On a speculative build, for example, Prologis might interact with IE as little as once or twice.  Low Depo. 46:21-47:11 (APEN0011-12).

27.    To the extent there was interaction between Prologis and subcontractors, it was interactions with individuals; Prologis did not necessarily know which company the employees worked for. Wyler Depo. 69:3-21 (APEN0047) .

28.    Prologis relied on TWC's judgment to execute projects and address any problems that may arise, including issues with subcontractors.  Kelley Depo. 88:24-89:6 (APEN0031-32) ("I trusted Mark and I trusted TWC in their judgment to execute the project, given the success of what we've done to date, and if there was an issue or something, that they would fix it and we wouldn't see any issues or - - as an owner, we shouldn't be concerned with this contractor dispute, and we would continue on as usual.").

**C.    IE's Claimed Copyrights**

29.    IE claims a copyright interest in technical drawings – which consist of two-dimensional illustrations of electrical systems that IE describes as "electrical engineering plans" (the "Technical Drawings").  (Doc. 188.)

30.    The electrical portion of the development projects—the Technical Drawings—at issue in this litigation comprise only a very small portion of the overall project. Low Depo. 41:2-11 (APEN0009).

31.    IE's Rule 30(b)(6) designee was unable to identify a single unique component of any of its "copyrighted plans." *See* M. Beverly Depo.  293:18-22 (APEN0156).

32.    Gustave Baquerizo, the former IE employee that prepared IE's alleged "copyrighted

plans," testified that the designs were vanilla, straightforward, "cookie cutter stuff." *See* Deposition Transcript of Gustavo Baquerizo ("Baquerizo Depo."), relevant portions of which are attached hereto as **Exhibit 7**, at 271:18-22 (APEN0160); *see also* Wyler Depo. 91:15-92:24 (APEN0056-57).

33. The Technical Drawings are "very vanilla," "generic," "rinse and repeat," can be quickly engineered, and contain no unique design components. Kelley Depo 68:6-20 (APEN0030) and 136:21-137:14 (APEN0040-41); Wyler Depo. 92:9-24 (APEN0057).

34. IE also claims a copyright interest in a template, which it describes as an AutoCAD file that it "uses to start work on all of their respective electrical engineer plans" (the "Template"). (Doc. 188.)

35. Interior Electric California filed a copyright application for the Template with the United States Copyright Office, and on June 5, 2018, the Copyright Office issued Registration No. VAU1-336-906 (the "'906 Registration"). *See* **Exhibit 8** (APEN0162).

36. Interior Electric California and IE are "completely separate companies." M. Beverly Depo. at 95:2-5 (APEN0149).

37. IE's Rule 30(b)(6) designees could not identify who prepared the template or where the information from the template came from. See M. Beverly Depo. at 201:12-22 (APEN0150); *see also* Deposition Transcript of Brandon Beverly ("B. Beverly Depo."), relevant portions of which are attached hereto as **Exhibit 9**, at 42:21-23 (APEN0168) .

**D.    TWC and IE Part Ways**

38. On March 30, 2017, TWC and IE's relationship terminated when TWC hired two former IE employees, Gus Baquerizo ("Baquerizo") and Clifford Anderson ("Anderson"), after IE terminated them. M. Beverly Deo. 45:21-46:9 (APEN0147-148).

39. Prologis was not involved in TWC's decision to terminate IE as a subcontractor, but Kelley and Wyler eventually became aware that TWC was no longer using IE as a subcontractor. Kelley Depo. 91:19-92:2 (APEN0033-34); Wyler Depo. at 76:5-19 (APEN0048).

40. Low testified that he had no knowledge that TWC ever switched to a different electrical engineering subcontractor. Low Depo. 64:14-24 (APEN0016).

41.     Prologis was not aware of the specific nature of the disagreement between TWC or the reasons TWC decided to cease working with IE. Kelley Depo. 114:8-18 (APEN0036); Wyler Depo. 82:18-83:3 (APEN0053).

42.     Prologis was not privy to any contract between TWC and IE, and did not know how the parties intended to transition the electrical work to another subcontractor. *Id*.

43.     After learning that TWC was no longer using IE as a subcontract, Prologis's primary concern was TWC moving the projects forward on an acceptable time frame, consistent with its contractual obligations. Wyler Depo. 77:17-78:7 (APEN0049-50); 95:1-9 (APEN0058).

44.     A change in subcontractor during a project likely would not affect the completion of the project. Wyler Depo. 80:10-14 (APEN0052) ("Q. Have you ever had a time where a switch like that happened which did impact the timing completion of the project? A. It hasn't been an issue on the Vegas stuff, Vegas is more straightforward.").

45.     Prologis did not anticipate a delay in any project due to a change in electrical subcontractor.  Wyler Depo. 85:10-16 (APEN0055).

46.     However, if an issue did arise, Prologis relied on and expected TWC to manage the issue and ensure that there would be no delay in moving projects forward. Kelley Depo. at 88:18-89:6 (APEN0031-32) (testifying that he "trusted TWC in their judgment to execute the project, given the success of what we've done to date," and trusted TWC to fix any issues that arose); Kelley Depo. 133:21-25 (APEN0039) ("That would just be the course of business that they would have to do in order to finish these projects, that they would have to come up with some solution, and that was really up to them because it was their contractor."); Low Depo. at 63:10-18 (APEN0015) (testifying that he would "look at the general if he's going to make a change not to have a delay or any cost change"); Wyler Depo. at 82:6-17 (APEN0053) ("For a sub under the GC, I would [look] to the GC to rectify . . . if it's just a vanilla building that we are building, building ten and are doing ten others usually you just roll right along.").

47.     Ultimately, TWC as the general contractor would be liable for any delays. Wyler Depo. at 79:21-80:9 (APEN0051) (testifying that "[t]he GC is the guarantor with, you know, penalties if they don't perform.").

48.    Kelley expected that TWC would work on an agreement with IE concerning payment for any work previously performed by IE and the transition of any IE drawings. Kelley Depo. 99:12-24 (APEN0035) .

49.    Prologis was not aware that TWC intended to use any drawings allegedly belonging to IE to finish any ongoing projects. Kelley Depo. at 131:21-132:25 (APEN0037); Low Depo. 68:8-13 (APEN0017) ("Q. Was there ever a time where you became aware that Interior Electric's plans were going to be used by a different subcontractor on TWC projects? A. No. I've never seen any of their work on a title block of drawings or whatnot. I have never seen anything that would indicate otherwise.").

50.    Specifically, Kelley testified that they did not know that TWC's new subcontractor was going to use IE's drawings—let alone use them without IE's permission. Kelley Depo. 131:21-132:25 (APEN0038) ( Q. Okay. So … was it your understanding that TWC's new subcontractor, whoever it may be, was going to get Interior Electric's drawings and use those to start on -- excuse me, to finish the design on some projects? . . . THE WITNESS: No. . . . .Mark Beverly never called me. I never got an e-mail from Interior Electric. So, I would have just assumed that there was some sort of an agreement or understanding that was established between the parties that would have allowed everything to continue going forward.").

51.    IE never alerted Prologis that TWC was continuing to use its drawings, and IE never advised Prologis that IE objected to such use. Kelley Depo. 132:17-21 (APEN0038).

**E.    IE's Claims Against Prologis**

52.    On June 22, 2018, IE filed the current lawsuit in which its Second Amended Complaint asserts five causes of action against Prologis: (1) contributory copyright infringement; (2) vicarious copyright infringement; (3) unjust enrichment; (4) civil conspiracy; and (5) aiding and abetting.

53.    When asked at his deposition, Brandon Beverly, IE's 30(b)(6) designee, could not explain why Prologis was named as a defendant in this case.  B. Beverly Depo. 66:14-20 (APEN0171) ("Q. Okay. So are you saying you don't -- you don't know why they're named as a defendant in this case? A. Personally I don't.").

### III.    LEGAL STANDARD

The Federal Rules of Civil Procedure provide for summary judgment when the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits, show that "there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The purpose of summary judgment is to "isolate and dispose of factually unsupported claims," *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986), thereby avoiding "unnecessary trials where no material factual dispute exists." *Zurich Am. Ins. Co. v. Coeur Rochester, Inc.*, 720 F. Supp. 2d 1223, 1227 (D. Nev. 2010). The court should award summary judgment if, after viewing the evidence and inferences arising therefrom in the light most favorable to the nonmoving party, "there is no legally sufficient evidentiary basis for a reasonable jury to find for the nonmoving party." *Id.*

To determine whether summary judgment is warranted, courts apply a burden-shifting analysis. "The moving party bears the initial burden of informing the court of the basis for the motion, together with evidence demonstrating the absence of any genuine issue of material fact." *Id.* (citing *Celotex Corp.*, 477 U.S. at 323). Once the moving party satisfies this initial burden, "the party opposing the motion may not rest upon mere allegations or denials in the pleadings, but must set forth specific facts showing that there exists a genuine issue for trial." *Id*. (citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249-50 (1986)).

### IV.    ARGUMENT

#### A.    IE Lacks Standing to Assert Copyright Claims Concerning the Template

As a threshold issue, IE lacks standing to assert a copyright infringement claim with respect to the Template because it does not own the copyright. The issue of standing "can be raised at any time, including by the court sua sponte." *United States v. Viltrakis*, 108 F.3d 1159, 1160 (9th Cir. 1997). A claimant that does not own a copyright "does not have standing to sue for infringement of the exclusive rights belonging to the owner." *Giddings v. Vision House Prod., Inc.*, 584 F. Supp. 2d 1222, 1228 (D. Ariz. 2008) (citing *Silvers v. Sony Pictures Entm't, Inc.*, 402 F.3d 881, 889 (9th Cir.2005)); *see also ABKCO Music, Inc. v. Harrisongs Music, Ltd.*, 944 F.2d 971, 980 (2d Cir. 1991) ("the Copyright Act does not permit copyright holders to choose third parties to bring suits

on their behalf").

The '906 Registration is owned by Interior Electric Incorporated in Orange, California ("Interior Electric California"). SUF ¶¶ 35-37. Indeed, IE directly states in the Complaint that Interior Electric California created and registered the Copyrighted Template. Doc. 188 at ¶¶138, 143. But Interior Electric California did not bring this action, and IE has provided no evidence of a license or assignment of the '906 Registration from Interior Electric California to IE. To the contrary, it admits IE and Interior Electric California are "completely separate companies." SUF ¶ 36. IE therefore has no standing to enforce the '906 Registration. Because IE has produced no evidence establishing standing to sue for infringement of the '906 Registration—and thus no genuine issue of material fact exists on an element IE must prove—summary judgment should be entered for Prologis on that claim.

**B.      IE's Claims Against Prologis for Contributory and Vicarious Infringement Fail as a Matter of Law**

The Court must grant summary judgment on IE's copyright claims against Prologis because the record lacks any legally sufficient evidence that could support a finding of contributory or vicarious copyright infringement.

1.      *Contributory Liability*

Contributory liability requires a showing that the defendant "'(1) has knowledge of another's infringement and (2) either (a) materially contributes to or (b) induces that infringement.'" *VHT, Inc. v. Zillow Grp., Inc.*, 918 F.3d 723, 745 (9th Cir. 2019) (quoting *Perfect 10, Inc. v. Visa Int'l Serv., Ass'n*, 494 F.3d 788, 795 (9th Cir. 2007)). As set forth below, there is an absence of evidence to support IE's claim for contributory copyright infringement, and the court must therefore dismiss the claim.

a.      *IE Cannot Establish the Knowledge Element of Contributory Infringement*

The knowledge element requires "more than a generalized knowledge . . . of the possibility of infringement," and IE must show that Prologis had actual knowledge or a reason to know of the specific acts of infringement. *Ludarts, LLC v. AT & T Mobility, LLC*, 710 F.3d 1068, 1072 (9th Cir.

FAEGRE DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW

2013). But IE has neither produced nor elicited any evidence supporting this element of contributory infringement and thus cannot establish the knowledge element as a matter of law.[3]

In fact, the only record evidence affirmatively shows that Prologis lacked actual knowledge of the alleged infringement and had no reason to know of it. Low testified that he was not aware that TWC changed electrical subcontractors and was not aware that IE's plans were going to be used by a different contractor. SUF ¶¶ 40; 49. Similarly, Kelley testified that he did not know that TWC's new subcontractor was going to use IE's drawings—let alone use them without IE's permission. SUF ¶ 50. Nor did Prologis have any reason to know of, or even suspect, the alleged infringement. Prologis, as the owner of the buildings for which TWC was engaged as the general contractor, had minimal interaction with subcontractors and little exposure to the mechanical, electrical, or plumbing plans submitted by subcontractors. SUF ¶¶ 23-26. Kelley, Low, and Wyler all consistently testified that they relied on the general contractor – in this case TWC – to address any issues that arose with subcontractors. SUF ¶¶ 28; 46. As to the specific disagreement between IE and TWC, Kelley testified that he assumed that TWC and IE would have reached an agreement or would have generated new drawings with a new subcontractor. SUF ¶ 48. IE never notified anyone at Prologis that TWC was using its allegedly copyrighted plans without permission. SUF ¶¶ 49-51. Thus, because TWC was the party that subcontracted with IE, and because Prologis relied on TWC as its general contractor to handle day-to-day construction, including any issues that arose with subcontractors, Prologis had no reason to know or suspect that TWC would allegedly continue to use IE's drawings without IE's permission.

Because IE has not produced—and cannot produce—any evidence establishing that Prologis knew or had reason to know of the alleged infringement, the essential element of knowledge is missing from IE's contributory infringement claim, and the claim fails as a matter of law. Indeed, the undisputed evidence affirmatively establishes that Prologis lacked knowledge of (and had no reason to know of) the alleged infringement in the first instance.

///

---

[3] Indeed, Brandon Beverly, IE's 30(b)(6) designee, could not even explain why Prologis was named as a defendant in this case. SUF ¶ 53.

b.      *IE Cannot Establish the Inducement Element of Contributory Infringement*

Inducement liability requires evidence of "'active steps . . . taken to encourage direct infringement.'" *VHT*, 918 F.3d at 745 (quoting *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913, 936 (2005)).[4] Evidence of active steps may include "advertising an infringing use or instructing how to engage in an infringing use," as such evidence shows "an affirmative intent that the product be used to infringe." *Id*. Here, there is no evidence that Prologis induced the alleged infringement.

IE has produced no evidence that Prologis took any "active" steps to encourage infringement or that Prologis had any affirmative intent for TWC to infringe IE's drawings. In fact, Prologis delegated decisions concerning the "construction means, methods, techniques, sequences and procedures" and wholly relied on TWC to "coordinat[e] all portions of the Work under the Contract." SUF ¶ 10. At most, the record shows that Prologis communicated to TWC its expectation that projects would be completed on time, consistent with the parties' contracts and that TWC would work out any issues with IE. SUF ¶ 43. However, the mere fact that Prologis expected TWC to remain on schedule notwithstanding conflicts with subcontractors or other issues – which it was bound to do pursuant to its contract – cannot rise to the level of inducement as a matter of law because it is not an "active step" taken to encourage infringement.

2.      *Vicarious Liability*

To prevail on a vicarious liability claim, the plaintiff must show that the defendant has "(1) the right and ability to supervise the infringing conduct and (2) a direct financial interest in the

---

[4] In the Ninth Circuit, a defendant can be liable under the material contribution prong of the contributory liability test "if it has actual knowledge that *specific* infringing material is available using its system, and can take simple measures to prevent further damage to copyrighted works, yet continues to provide access to infringing works" *Perfect 10, Inc. v. Giganews*, 847 F.3d 657, 671 (9th Cir. 2017) (emphasis added).  This standard is tailored for internet service providers and online systems, and it applies only where a defendant has a *system* through which infringing works are accessed and where the defendant, with actual knowledge that specific infringing material is available, continues to provide access despite having the ability to implement simple technological blocks.  None of those circumstances exist here. Prologis did not operate any system providing access to IE's drawings and had no actual knowledge of any alleged reuse.  Because IE cannot satisfy even the threshold predicate of the Ninth Circuit's material-contribution framework, its claim fails as a matter of law with respect to this prong of the test.

infringing activity." *VHT*, 918 F.3d at 746 (internal quotations omitted).

The first element of the test requires "both a legal right to stop or limit the directly infringing conduct, as well as the practical ability to do so." *Id*.

There is no evidence in the record that Prologis had the legal right and ability to supervise the alleged infringing conduct. While Prologis certainly had some limited say with respect to subcontractors, those rights were limited to the right to reject any subcontractor originally proposed by TWC at the outset of a project if Prologis had a reasonable objection. SUF ¶ 14. Prologis's contract with TWC does not require that TWC obtain permission from Prologis to change a subcontractor that was previously selected; it only precludes TWC from changing contractors if Prologis or the architect raises an objection to the change. SUF ¶ 17. There is no requirement in the contract that TWC notify Prologis of a change in subcontractor, and in fact Prologis did not learn that TWC was no longer using IE as a subcontractor until after the fact. SUF ¶¶ 18; 39-40.

There was nothing inherently unlawful about TWC's decision to switch subcontractors, and there is nothing in the record that suggests Prologis had a legal right to dictate to TWC how to manage its relationship with the subcontractors it selected. To the contrary, the contract allocated sole responsibility for retention and management of subcontractors to TWC, and Prologis's former employees all consistently testified that it was TWC's responsibility to effectively manage its subcontractors. SUF ¶ 46. Notably, the Ninth Circuit has held that "the ability to exert financial pressure" does not equate to "the right or ability to control the actual infringing activity" where there is no absolute right to stop the activity. *Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 788, 804 (9th Cir. 2007).

As to "direct financial interest," there is no evidence in the record suggesting that Prologis had a financial interest in the infringement. IE's only theory of financial interest is that TWC's alleged infringement of the alleged copyrighted material allowed TWC to complete projects on time. But there is no evidence that this is in fact the case. To the contrary, the evidence in the record establishes that there was nothing unique in IE's electrical engineering plans, and they could have been quickly redrawn or reengineered without an impact on the construction schedule. SUF ¶ 31-33. Accordingly, IE can present no evidence that Prologis is vicariously liable for copyright

FAEGRE DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW

15

infringement, and the Court should award summary judgment.

### C. IE Has Not Asserted a Cognizable Damages Theory.

#### 1. *IE Cannot Recover Profits From Prologis Because It Cannot Establish a Causal Nexus as a Matter of Law*

IE seeks recovery of Prologis's rental profits, if any, but it cannot meet its burden of establishing a causal nexus between the alleged infringement and those profits. Because IE can provide no non-speculative evidence that Prologis's rental revenues were in any way generated by the alleged infringement, it is not entitled to recover profits as a matter of law.

Under 17 U.S.C. § 504(b), a plaintiff seeking to recover an infringer's profits must first establish a causal nexus between the alleged infringement and the profits sought. *Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 708 (9th Cir. 2004), *as amended on denial of reh'g and reh'g en banc* (Oct. 25, 2004), *opinion amended on denial of reh'g*, No. 03-35188, 2004 WL 2376507 (9th Cir. Oct. 25, 2004). "When an infringer's profits are only remotely and speculatively attributable to infringement, courts will deny recovery to the copyright owner." *Id*. Quoting 4 Nimmer On Copyright § 14.03, 14–34; *see also Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc*., 772 F.2d 505, 517 (9th Cir. 1985) ("a court may deny recovery of a defendant's profits if they are only remotely or speculatively attributable to the infringement"). Therefore, the Court must undertake "a threshold inquiry" to determine whether there is a "legally sufficient causal link." *Mackie v. Rieser*, 296 F.3d 909, 915 (9th Cir. 2002). If a plaintiff "cannot articulate a non-speculative correlation" between the infringement and the profits sought, summary judgment is mandatory. *Id.* at 916.

Here, IE seeks to recover the entirety of Prologis's rental profits (if any)[5] derived from buildings for which TWC allegedly used IE's copyrighted electrical plans. In prior briefing in this case, IE asserted that it was entitled to these profits (if any) because Prologis "(1) risked incurring liquidated damages under its leases if its projects did not meet the ambitious construction schedules

---

[5] As IE has never articulated a damages calculation with respect to Prologis's profits. *See* Section C.3, *infra*. For purposes of this motion, Prologis assumes that IE seeks to recover all profits, if any, generated from both the Subject Properties and the Additional Properties.

the company promised its tenants, and (2) was able to generate revenue from its projects earlier if it did not waste time re-drawing engineering plans." (Dkt. 380.) This is precisely the type of speculative or remote theories of recovery that courts routinely reject. *Thomson v. HMC Grp.*, 2015 WL 11256775 (C.D. Cal. Oct. 29, 2015) (finding no causal nexus between the alleged infringement of plaintiff's copyrighted technical drawings for operating rooms and defendants' profits and holding that the correct measure of damages would be the fair market value of the architectural plans at issue). Further, the record contains no evidence—expert or otherwise—showing that the use of these plans accelerated construction, avoided delay, affected completion dates, or led in any way to Prologis earning rental income.

Tellingly, in initially dismissing IE's unjust enrichment claim against Prologis, this Court observed that IE's allegation "that by allowing Baquerizo, Anderson, and others to use Interior Electric's copyrighted plans rather than require them to create new ones, Prologis was able to collect rental revenue from its tenants earlier than it would have otherwise been able to" was speculative and lacking factual support. *Interior Electric Inc. Nevada v. T.W.C. Construction Inc.*, 2020 WL 719410, at *6 (Feb. 12, 2020). According to the Court, "Prologis's awareness that Interior Electric performed some work on TWC construction projects and then others ultimately completed the work does not permit a reasonable inference that Prologis knew of—much less appreciated the benefit from—the new subcontractors' use of Interior Electric's copyrighted plans." *Id*. After five years of discovery, nothing has changed. IE's theory that Prologis was able to collect rental revenue as a result of the infringement is still entirely speculative, and IE has put forward no factual evidence to support it. There is no evidence in the record from which any reasonable juror could conclude that Prologis knew of, much less profited from, the new subcontractors' use of IE's plans. SUF ¶¶ 39-51.

IE has not identified a single property for which TWC's alleged use of IE's alleged copyrighted plans avoided a delay in completing this project on the schedule. More fundamentally, there is no evidence in the record that TWC would not have satisfied the substantial completion deadline *on any project* had it not committed the alleged infringement. The record establishes the opposite: the drawings at issue were straightforward and largely generic such that creating new

FAEGRE DRINKER BIDDLE & REATH LLP
ATTORNEYS AT LAW

17

drawings would not have caused delay. SUF ¶¶ 31-33.  Thus, the risk of a schedule disruption was remote.

Even if IE had evidence of potential delay, Prologis's contracts with TWC expressly required TWC—not Prologis—to pay liquidated damages resulting from late completion. SUF ¶ 19. This contractual allocation of risk is a complete break in the causal chain: any impact of the drawings on schedule would affect TWC, not Prologis.  Likewise, IE offers no evidence that the reuse of drawings accelerated completion, or that any tenant occupancy or rent commencement date was earlier because of the alleged infringement.

       2.    *IE Disclosed No Expert Evidence To Support Its Scheduling Impact Theory, Rendering Its Indirect Profits Claim Impermissibly Speculative.*

IE's causal nexus theory fails for the additional and independent reason that IE disclosed no expert capable of testifying about construction sequencing, schedule impacts, or the alleged delay avoidance that forms the backbone of its profits claim. Establishing that the alleged reuse of drawings prevented a construction delay—and therefore accelerated rental income and avoided liquidated damages—requires specialized engineering and scheduling expertise, which is beyond the common knowledge of a layperson. Because IE lacks any expert evidence on this front, its damages theory is irreparably speculative under *Mackie* and *Polar Bear*, and the Court must grant summary judgment.  *See McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 808 (9th Cir. 1988) (requiring expert analysis where jury otherwise would be "left to 'speculation or guesswork' in determining the amount of damages to award"), quoting *Dolphin Tours v. Pacifico Creative Serv.*, 773 F.2d 1506, 1509–10 (9th Cir. 1985) ("Summary judgment is appropriate where [the plaintiff has] no expert witnesses or designated documents providing competent evidence from which a jury could fairly estimate damages.").

       3.    *IE Is Independently Barred From Seeking Indirect Profits Because It Failed to Disclose Any Computation or Methodology Under Rule 26.*

Finally, even if Prologis's profits (to the extent it had any) were theoretically available, and even if their computation did not require expert testimony, IE cannot recover them because it has not disclosed them as a category of damages (and likewise failed to disclose any related

computation or methodology) under Rule 26. Rule 26(a)(1)(A)(iii) requires disclosure of "a computation of each category of damages" and the documents on which that computation is based." A plaintiff "has a duty to diligently obtain the necessary information and prepare and provide its damages computation within the discovery period." *Jackson v. United Artists Theatre Cir., Inc.*, 278 F.R.D. 586, 593 (D. Nev. 2011). Here, despite fourteen (14) supplementations to its initial disclosures over the past seven years of litigation, IE identified no formula, no methodology, no data, and no apportionment theory supporting a claim for recovery of all (or a portion of) Prologis's profits, if any. *See* Interior Electric's Fourteenth Supplement to Initial Disclosure of Witnesses and Documents Pursuant to FRCP 26(a)(1), a copy of which is attached hereto (without attached documents) as **Exhibit 10**, at pages 34-35 (APEN0207-208). Nor did it disclose Prologis's profits as a category of damages it would seek in its complaint.

And even setting all of this aside, IE's decision to seek expansive discovery regarding the Additional Properties adds considerable confusion to the matter. Specifically, it remains unclear which, if any, of the Additional Properties are targets of IE's undisclosed damages theory

Under Rule 37(c)(1), a party that fails to disclose required information "is not allowed to use that information… unless the failure was substantially justified or harmless." The failure to disclose damages calculations during discovery has led to Rule 37(c)(1) sanctions in the Ninth Circuit. *See, e.g., Hoffman v. Constr. Protective Servs., Inc.*, 541 F.3d 1175, 1180 (9th Cir. 2008), *as amended* (Sept. 16, 2008) (affirming district court's Rule 37(c)(1) sanction excluding damages evidence for failure to disclose damages calculations); *Jackson* at 595 (awarding lesser sanctions where late disclosure of damages computation did not require reopening discovery or delaying trial); *Use Techno Corp. v. Kenko USA, Inc.*, No. C-06-02754 EDL, 2007 WL 4169487, at *3 (N.D. Cal. Nov. 20, 2007) (damages evidence excluded for failure to provide computation for defendant's profits in false advertising claim). A plaintiff "cannot shift to the defendant the burden of attempting to determine the amount of the plaintiff's alleged damages." *Jackson* at 593. This is particularly true where, as here, it is entirely unclear as to what portion of Prologis's rental revenues IE believes

are at issue.[6]

IE's failure to disclose any computation or methodology to calculate Prologis's profits (or even that general category of damages) requires automatic exclusion and therefore provides an independent basis for summary judgment.

    *4.    IE is Not Entitled to Statutory Damages or Attorneys' Fees*

To the extent IE seeks attorneys' fees and/or statutory damages, Prologis should be granted summary judgment because IE is not entitled to either as a matter of law. Summary judgment as to the non-recovery of attorneys' fees or statutory damages is proper where the only infringement is alleged to have occurred before the works were registered. *B2B CFO Partners, LLC v. Kaufman,* 2011 WL 587165, *6 (D. Ariz. Feb. 8, 2011) (granting summary judgment in defendants' favor on plaintiffs' claims for attorneys' fees where infringement began prior to registration). Here, there is no dispute that IE registered the alleged copyrighted materials after the alleged infringement, and therefore Prologis is entitled to summary judgment on these theories of damages.

**D.    IE's State Law Claims Against Prologis are Preempted by the Copyright Act**

IE's state law claims for unjust enrichment, civil conspiracy, and aiding and abetting are preempted by the Copyright Act. The Copyright Act "expressly preempts state claims where the plaintiff's work 'come[s] within the subject matter of copyright' and the state law grants 'legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright.'" *Doe 1 v. GitHub, Inc.*, 672 F. Supp. 3d 837, 856 (N.D. Cal. 2023) (quoting 17 U.S.C. § 301(a)). The Ninth Circuit applies a two-part test to determine whether a state law claim is preempted. *Laws v. Sony Music Entertainment, Inc.*, 448 F.3d 1134, 1137 (9th Cir. 2006). The court must first determine whether the subject matter of the state law claim falls within the subject matter of copyright and, if it does, the court must then determine "whether rights asserted under the state law are equivalent to the rights contained in 17 U.S.C. § 106, which articulates the exclusive rights of copyright holders." *Laws*, 448 F.3d at 1137-38. "If a state law claim includes an 'extra element'

---

[6] In the briefing on this issue, it seems that IE may be arguing that it is entitled to any liquidated damages amounts that Prologis supposedly avoided paying and any revenue it collected earlier than it otherwise would have. But the discovery it served in this matter was not narrowly tailored to those issues—instead it simply sought all rental revenue collected in connection with each property.

that makes the right asserted qualitatively different from those protected under the Copyright Act, the state law claim is not preempted by the Copyright Act." *Altera Corp. v. Clear Logic, Inc.*, 424 F.3d 1079, 1089 (9th Cir. 2005) (quoting *Summit Mach. Tool Mfg. v. Victor CNC Sys.*, 7 F.3d 1434, 1439-40 (9th Cir. 1993)). Each of IE's formulaic state law claims fail to include any such extra element and are preempted.

### 1.    *IE's Unjust Enrichment Claim is Preempted*

IE's unjust enrichment claim is preempted because it falls entirely within the subject matter of copyright and asserts no qualitatively different right. *Laws, supra*. IE bases this claim on the allegation that Prologis and other defendants "accepted and retained…benefits under circumstances such that it would be inequitable for Defendants to retain the benefits without payment for the value thereof." Dkt. 188 at ¶¶ 487-91. But instead of identifying any specific conduct by Prologis, or any specific benefit it accepted and retained, IE simply "repeats, re-alleges, and incorporates each and every paragraph above[.]" The only preceding allegations against Prologis in the Complaint are those directly relating to copyright infringement and the allegedly unauthorized use of IE's (and Interior Electric California's) copyrighted designs. *See, e.g.,* Dkt. 188 at ¶¶ 446-52. In other words, IE's allegation amounts to a claim that Prologis unjustly benefited from copyright infringement and nothing else. Such claims, lacking the assertion of any qualitatively different right from those protected under the Copyright Act, are preempted in this Circuit. *See Doe 1 v. GitHub, Inc.*, 672 F. Supp. 3d 837, 857 (N.D. Cal. 2023) (unjust enrichment claim based on reproduction of plaintiff's work and unauthorized derivative works preempted by Copyright Act); *Martin v. Walt Disney Internet Grp.*, No. 09CV1601-MMA, 2010 WL 2634695, at *7 (S.D. Cal. June 30, 2010) (unjust enrichment claim preempted by Copyright Act where plaintiff failed to allege basis for claim other than unauthorized use of copyrighted work); *see also Kodadek v. MTV Networks, Inc.*, 152 F.3d 1209, 1213 (9th Cir. 1998) (preempted unfair competition claim incorporating copyright allegations by reference "based solely on rights equivalent to those protected by the federal copyright laws").

### 2.    *IE's Civil Conspiracy and Aiding and Abetting Claims are Preempted*

IE's conspiracy and aiding and abetting claims are likewise preempted. A claim for conspiracy requires "a combination of two or more persons who, by some concerted action, intend

to accomplish some unlawful objective for the purpose of harming another which results in damage." *Cap. Advisors, LLC v. Cai*, 140 Nev. Adv. Op. 34, 548 P.3d 1202, 1211 (2024). Although IE's blanket civil conspiracy allegations are brought against nearly all defendants—with a laundry list of alleged conduct unattributed to any one defendant, *see* Dkt. 188 at ¶¶ 527-531—the only conduct IE specifically attributes to Prologis in the Complaint concerns the alleged use of copyrighted designs. *See, e.g.,* Dkt. 188 at ¶¶ 446-52. This is nothing more than a claim that Prologis intended to infringe IE's copyright, and "claims for conspiracy to violate the Copyright Act are preempted by federal copyright law." *Gym Door Repairs, Inc. v. Young Equip. Sales, Inc.*, 206 F. Supp. 3d 869, 916 (S.D.N.Y. 2016) (quoting *Irwin v. ZDF Enterprises GmbH*, No. 04–cv–8027 (RWS), 2006 WL 374960, at *4 (S.D.N.Y. Feb. 16, 2006)); *see also Idema v. Dreamworks, Inc.*, 162 F. Supp. 2d 1129, 1193 (C.D. Cal. 2001), *aff'd in part, dismissed in part*, 90 F. App'x 496 (9th Cir. 2003), *as amended on denial of reh'g* (Mar. 9, 2004) (conspiracy claim preempted "to the extent it attempts to seek liability under this alternate theory for the same conduct challenged under copyright").

IE's aiding and abetting claim fares no better. A claim for aiding and abetting requires establishing "(1) there [is] a fiduciary relationship between two parties, (2) that the fiduciary breached, (3) the defendant third party knowingly and substantially participated in or encouraged that breach, and (4) the plaintiff suffered damage as a result of the breach." *Guilfoyle v. Olde Monmouth Stock Transfer Co.*, 130 Nev. 801, 812–13, 335 P.3d 190, 198 (2014). Again, IE puts forward another formulaic recitation of the elements in a blanket allegation against nearly all defendants, when Prologis is not alleged to have done more than participate in copyright infringement. *See* Dkt. 188 at ¶¶ 446-52. As with its other state law claims, IE's aiding and abetting claim necessarily fails because it is based entirely on allegations that Prologis committed copyright infringement, with no other discernable rights at issue. *See Sybersound Recs., Inc. v. UAV Corp.*, 517 F.3d 1137, 1150 (9th Cir. 2008) (affirming lower court's dismissal of "copyright claims dressed up to look like state law claims"). IE has not put forth any evidence to the contrary.

Accordingly, the Court should enter summary judgment in favor of Prologis because Counts 13, 20, and 21 of IE's Complaint are preempted by the Copyright Act.

**E.    Prologis Is Also Entitled to Summary Judgment on IE's State Law Claims Because They Lack Essential Supporting Evidence.**

1.    *IE's Civil Conspiracy Claim Fails Because There Is No Evidence of Intent.*

Civil conspiracy is a "combination of two or more persons who, by some concerted action, intend to accomplish an unlawful objective for the purpose of harming another, and damage results from the act or acts." *Consolidated Generator-Nevada, Inc. v. Cummins Engine Co., Inc.*, 114 Nev. 1304, 1311, 971 P.2d 1251, 1256 (Nev. 1998). Aiding and abetting creates liability where "the defendant substantially assists or encourages another's conduct in breaching a duty to a third person." *Dow Chemical Co. v. Mahlum,* 114 Nev. 1468, 1490, 970 P.2d 98, 112 (Nev. 1998).

There is no evidence in the record that Prologis had intent to accomplish an unlawful objective, any concerted action by Prologis and the other defendants, or any substantial assistance or encouragement from Prologis regarding the other torts alleged in the Complaint. Instead, the undisputed facts demonstrate that Prologis hired TWC as its general contractor and was only generally aware that TWC subcontracted with IE. SUF ¶¶ 7-8; 26.  Prologis had minimal interaction with IE, and what little interaction it did have flowed through TWC. SUF ¶¶ 23-26.  As its general contractor, Prologis relied on TWC to manage relationships with subcontractors SUF ¶ 46; it had no knowledge of the particulars of any disagreement between TWC and IE and no knowledge that TWC (allegedly) intended to use IE's drawings and templates without IE's consent. SUF ¶¶ 41; 48. Given the nature of the parties' relationship, there is no evidence that Prologis intended to accomplish any unlawful objective, and Prologis is entitled to summary judgment on this claim.

2.    *IE's Aiding and Abetting Claim Fails Because There is No Evidence of Substantial Assistance or Encouragement.*

Aiding and abetting creates liability where "the defendant substantially assists or encourages another's conduct in breaching a duty to a third person." *Dow Chemical Co. v. Mahlum*, 114 Nev. 1468, 1490, 970 P.2d 98, 112 (Nev. 1998).  Consistent with the above discussion, IE has adduced no evidence at all of any active assistance or encouragement, much less *substantial* assistance or encouragement that could qualify under applicable law.

### 3.    *IE's Unjust Enrichment Claim Fails Because There Is No Evidence That IE Conferred A Benefit On Prologis Of Which It Was Aware.*

In Nevada, "[u]njust enrichment exists when the plaintiff confers a benefit on the defendant, the defendant appreciates such benefit, and there is acceptance and retention by the defendant of such benefit under circumstances such that it would be inequitable for him to retain the benefit without payment of the value thereof." *Certified Fire Prot. Inc. v. Precision Constr.*, 283 P.3d 250, 257 (Nev. 2012) (simplified); *see Christiana Trust v. SFR Investments Pool 1, LLC*, 2018 WL 6603643 (D. Nev. Dec. 17, 2018) (listing these three elements of unjust enrichment under Nevada law).  None are satisfied here.

As a threshold matter, even if IE could show it conferred a benefit on the party it contracted with, it did not confer a benefit on *Prologis*, as Prologis had no dealings of any kind with IE.  SUF ¶¶ 21-23. IE's suggestion that Prologis enjoyed a downstream benefit does not suffice, as multiple cases have found this element is not satisfied where the plaintiff purportedly confers a benefit on a particular party or co-defendant, who then later causes the defendant seeking dismissal to benefit in the same way.  *See, e.g., U.S. Bank Nat'l Ass'n v. Saticoy Bay LLC*, No. 2:16-cv-01346-JCM-CWH, 2017 WL 277494, at *4 (D. Nev. Jan. 19, 2017) (dismissing unjust enrichment claim where property buyer's alleged acquisition and usage "were not benefits plaintiff conferred on defendant"); *WMCV Phase 3, LLC v. Shushok & McCoy, Inc.*, 750 F. Supp. 2d 1180, 1197 (D. Nev. 2010) (dismissing unjust enrichment claim where the complaint alleged that the defendant's benefit was received from co-defendants, not from the plaintiff directly); *Chemeon Surface Tech., LLC v. Metalast Int'l, Inc.*, 312 F. Supp. 3d 944, 956 (D. Nev. 2018) (dismissing unjust enrichment claim where plaintiff alleged that an employee "improperly acquired the specimens from [plaintiff's] database and then gave those specimens to" the moving defendants).  Even if, however, a downstream benefit from other parties could suffice, it does not here as IE has not adduced any evidence showing Prologis "appreciated the benefit" (i.e. was aware of it) per the second element, as it is undisputed that Prologis was wholly unaware.  SUF ¶ ¶¶ 42; 49.  This is independently dispositive.  *See Allegiant Air, LLC v. AAMG Mktg. Grp., LLC*, No. 64182, 2015 WL 6709144, at *3 (Nev. Oct. 29, 2015) ("To appreciate a benefit, the party must have knowledge of the benefit.");

*Christiana Trust v. SFR Investments Pool 1, LLC*, 2018 WL 6603643, at \*7 (dismissing unjust enrichment claim where Plaintiff failed to "address, with either law or fact, how [defendant] appreciated these rental proceeds as a conferred benefit"). Finally, given the failure of the first two elements, the third fails as well, as IE cannot demonstrate it was "inequitable" for Prologis to retain any benefit where, as here, the benefit was not conferred on Prologis and Prologis wasn't even aware of any alleged conferral until after the fact. Accordingly, this claim fails for want of evidence as well.

## V.    CONCLUSION

For all these reasons, Prologis respectfully requests that this Court grant judgment in its favor and against IE on all of it claims against Prologis.

Dated this day of 24th November, 2025.

MCDONALD CARANO LLP

By: */s/ Aaron D. Shipley*
    Aaron D. Shipley (#8258)
    Rory T. Kay (#12416)
    2300 West Sahara Avenue, Suite 1200
    Las Vegas, Nevada 89102

    Louis T. Perry (admitted pro hac vice)
    Faegre Drinker Biddle & Reath LLP
    300 N. Meridian Street, Suite 2500
    Indianapolis, IN 46204

    *Attorneys for Defendant Prologis, L.P.*

FAEGRE DRINKER BIDDLE &
REATH LLP
ATTORNEYS AT LAW

25

**CERTIFICATE OF SERVICE**

I hereby certify that on this 24th day of November, 2025, a true and correct copy of **PROLOGIS, L.P.'S MOTION FOR SUMMARY JUDGMENT** was served via the United States District Court CM/ECF system on all parties or persons requiring notice.

By: */s/ Leah Jennings*

An employee of McDonald Carano LLP

FAEGRE DRINKER BIDDLE & REATH LLP
ATTORNEYS AT LAW

26