**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| Interior Electric Incorporated Nevada,<br>Plaintiff<br>v.<br>T.W.C. Construction, Inc., et al.<br>Defendants | Case No.: 2:18-cv-01118-JAD-MDC<br>**Order Granting Defendants' Motion for Summary Judgment on Federal Claims and Dismissing Remaining Claims Without Prejudice to Refiling in State Court**<br>[ECF Nos. 383, 385, 387, 388, 423] |
| And all other claims and parties | |

Prologis, L.P. is an industrial real-estate company that owns, constructs, and leases commercial-distribution centers across the Las Vegas area. Prologis hired TWC. Construction, Inc. as its general contractor for several of these projects. TWC in turn hired Interior Electric Inc. Nevada (IE-NV) as its electrical design-build subcontractor on those projects and several others. While working on those projects, two key IE-NV employees left to start another electrical subcontracting business. TWC and IE-NV's relationship fell apart as a result, and TWC tapped those employees to complete its work on nine former IE-NV projects.

IE-NV now sues TWC, Prologis, and those former employees, alleging that the employees stole its copyrighted AutoCAD template and copied its electrical plans for those nine projects. IE-NV also claims that TWC breached its contract and that its employees breached their fiduciary duties to IE-NV. TWC countersues IE-NV, theorizing that it was actually IE-NV that first breached the contract because it was submitting fraudulent labor affidavits and that breach absolved TWC of performance.

But IE-NV lacks standing to pursue the template's copyright because IE-NV's California counterpart owns those rights and assigned them to IE-NV too late and without disclosing the assignment. And the copyright claims related to the plans similarly fail because an infringement claim requires more than just copying. Electrical plans receive "very thin" copyright protection because unprotectable external factors heavily dictate their design, and IE-NV declined to identify what specific protectable elements defendants' plans unlawfully copied. So I grant defendants summary judgment on the copyright claims. And without any federal claims to anchor jurisdiction here, I dismiss the state-law claims without prejudice to their refiling in state court because those claims are between largely non-diverse parties and raise complex and novel issues of state law.

**Background**

Mark Beverly owns a family of related but independent electrical-engineering companies including IE-NV, Interior Electric Inc. (California) (IE-CA), and a number of entities collectively called Integrated Energy Systems (IES).[1] IE-NV handles commercial electrical work in Nevada, IE-CA handles the same work in California, and IES no longer operates but handled solar work in California and Nevada.[2] IE-NV employed Gus Baquerizo and Clifford Anderson.[3] Baquerizo ran IE-NV's office and was a senior project manager responsible for

---

[1] ECF No. 387-2 at 7 (85:7–11); ECF No. 383-2 at 326 (23:5–12), 345 (99:16–19), 377 (228:16–24). The parties agree that IES is separate from IE-NV and IE-CA and treat it like it is a single entity, but they don't elaborate on what exactly IES's corporate form was. It appears to have been multiple companies. *See* ECF No. 383-2 at 395 (284:10–20).

[2] ECF No. 383-2 at 345 (99:16–19), 373 (210:14–18); ECF No. 383-3 at 334 (45:5–13).

[3] *See* ECF No. 383-2 at 4.

drafting IE-NV's electrical designs,[4] while Anderson estimated project costs and prepared bids.[5] Baquerizo and Anderson partially owned some of the IES entities with Mark Beverly.[6]

Almost three decades ago, someone within the Interior Electric family developed an AutoCAD template for electrical-engineering plans.[7] The template "comprises a fixed layout positioning the electrical legend, project notes, sheet index, new light fixture schedule, and title block on the first page."[8] IE-NV also alleges its template consists of "the contents of the electrical legend, project notes, and top portion of the title block," "a proprietary panel board design, typically programmed to display one or more panel boards on the last page of the plans, and programmed to populate said panel boards with data" from others software, and a "title block . . . in a fixed position on every page of the electrical engineering plans."[9]

### A. TWC hires IE-NV, but their relationship falls apart after Baquerizo and Anderson leave IE-NV.

TWC Construction, Inc. is a general contractor on several projects for Prologis, L.P. and others.[10] TWC retained IE-NV as an electrical design-build contractor for at least four Prologis projects and five other projects in Las Vegas.[11] But in the midst of those projects, Mark Beverly

---

[4] *Id.* at 181–182 (36:13–20, 37:2–18, 41:1–11), 185 (51:6–17, 346 (103:7–14).

[5] *Id.* at 184 (47:5–8).

[6] *Id.* at 181 (35:15–24).

[7] *Id.* at 239–40 (269:25–270:19), 371–72 (205:4–207:14). The parties dispute who created the template. Mark Beverly claims that he and another IE employee created the template. *Id.* at 371–72 (205:4–207:14); ECF No. 405 at 5. Baquerizo claims that he developed the template in his free time. ECF No. 383-2 at 226–227 (216:19–218:9), 239–40 (269:25–270:19).

[8] ECF No. 188 at 19.

[9] *Id.*

[10] ECF No. 383-2 at 3.

[11] *Id.*

learned that Baquerizo and Anderson intended to start their own electrical subcontractor, BAMM, and he fired them.[12] TWC then froze payments to IE-NV.[13] IE-NV in turn terminated its relationship with TWC, and TWC engaged Baquerizo and Anderson as consultants to finish the projects.[14]

At the time of these terminations, IE-NV had started electrical plans for each project using the template.[15] Baquerizo obtained copies of at least some of those plans,[16] which bore IE-NV's logo, name, and address.[17] Some plans also had logos for IES on them.[18] Baquerizo then submitted ostensibly very similar electrical plans to TWC and Prologis,[19] who used the plans to complete their projects.[20] The plans that Baquerizo submitted contained many of the same typos and spelling errors present in IE-NV's template and plans.[21] The submitted plans did not include

---

[12] *Id.* at 4.

[13] ECF No. 387-18.

[14] ECF No. 383-2 at 4–5.

[15] *See* ECF Nos. 387-57 (ProCaps III plan), 387-60 (Speedway II plan), 387-67 (LVCC 13 Dr. Pepper plan), 387-70 (LVCC 9 plan), 387-72 (LVCC 14 plan), 387-74 (Craig & Walnut plan). The complaint also mentions the Diamond Concrete Cutting, Lake Industries, and Executive Airport Industrial Parc 2 projects, but IE-NV did not include (or failed to identify) those plans as exhibits to any of its summary-judgment briefs. ECF No. 188 at 32–34. IE-NV also attaches a supposedly copied plan not mentioned in its complaint. *See* ECF Nos. 188, 387-63 (Quest Cyto plan).

[16] *See, e.g.*, ECF Nos. 387-55, 387-69.

[17] *See* ECF Nos. 387-57 (ProCaps III), 387-60 (Speedway II), 387-67 (Dr. Pepper plans), 387-70 (LVCC 9), 387-72 (LVCC 14), 387-74 (Craig & Walnut).

[18] *See* ECF Nos. 387-67, 387-70, 387-72, 387-74.

[19] *Compare* ECF Nos. 387-57, 387-60, 387-67, 387-70, 387-72, 387-74 (IE-NV plans) *with* ECF Nos. 387-58, 387-61, 387-68, 387-71, 387-73, 387-75 (purportedly copied plans).

[20] *See* ECF No. 383-2 at 5.

[21] *Compare* ECF Nos. 387-57, 387-60, 387-67, 387-70, 387-72, 387-74 (IE-NV plans) *with* ECF Nos. 387-58, 387-61, 387-68, 387-71, 387-73, 387-75 (purportedly copied plans).

IE-NV's logo or other such identifying information,[22] and each submitted plan contained at least some differences from IE-NV's plans.[23]

**B. Copyrights for the template and plans were registered, and IE-NV filed suit.**

IE-CA registered its template's copyright with the United States Copyright Office and obtained registration number VAU1-336-906 ('906 registration),[24] while IE-NV registered its individual electrical plans.[25] IE-NV then filed suit in this court, alleging that TWC, Baquerizo, Anderson, and two electrical-contracting entities at which they worked (Power On and BAMM) directly infringed its copyright and removed its copyright-management information in violation of the Digital Millenium Copyright Act.[26] It also alleged that Prologis, TWC, and Baquerizo were contributorily and vicariously liable for the infringement.[27] Relying on this court's supplemental jurisdiction, IE-NV also brought eighteen state-law claims broadly alleging that TWC breached its contract with IE-NV and violated Nevada law, and that Baquerizo and Anderson breached their fiduciary duty to IE-NV.[28] TWC countersued IE-NV and IE-CA,

---

[22] *See* ECF Nos. 387-58, 387-61, 387-68, 387-71, 387-73, 387-75.

[23] *See* ECF No. 383-3 at 38–63.

[24] ECF No. 386-8; ECF No. 383-2 at 748.

[25] ECF Nos. 387-43–387-52.

[26] ECF No. 188 at 54–57.

[27] *Id.* at 55–56.

[28] *See generally id.* The complaint alleges state-law claims for breach of contract and breach of the implied covenant of good faith and fair dealing, a claim against a bond under NRS 108.2421, violations of NRS 624.624, breach of fiduciary duty, intentional interference with prospective economic advantage, misappropriation of trade secrets, conversion, unjust enrichment, fraud in the inducement, deceptive trade practices, declaratory relief, quantum meruit, promissory estoppel, civil conspiracy, and aiding and abetting. *Id.*

alleging that IE-NV was submitting fraudulent labor affidavits, thereby absolving TWC of its performance obligation.[29]

All parties to the copyright claims now crossmove for summary judgment.[30] Relevant here, defendants contend that IE-NV lacks standing to pursue the '906 registration because IE-CA owns that registration and IE-NV did not produce any document in discovery showing that IE-CA exclusively licensed or assigned that right to IE-NV.[31] Defendants also contend that the template and plans consist of unprotectable, functional elements, and IE-NV failed to identify what was protectable in the plans.[32]

IE-NV disagrees and submits that summary judgment should be entered in its favor on the copyright claims.[33] It argues that it does have standing and reveals, for the first time, a 2024 intercompany agreement granting IE-NV an exclusive license to the '906 registration, backdating the license to 2004, and assigning any accrued causes of action for prior infringement of the '906 registration.[34] It also argues that the evidence of copying is overwhelming—including identical

[29] *See generally* ECF No. 248. The countercomplaint alleges state-law claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and violations of the Nevada deceptive trade practices act. *Id.*

[30] ECF Nos. 383, 385, 387, 388.

[31] ECF Nos. 383, 386, 388, 389, 413, 414.

[32] *Id.* Defendants further challenge the ownership and authorship of the template and plans, whether the plans were copied, and whether IE-NV can prove damages. *See, e.g.*, ECF No. 383 at 13–23. TWC and Prologis additionally argue that nothing supports that they had the requisite knowledge or control needed for a contributory or vicarious copyright-infringement claim. *See, e.g.*, *id.* at 20–21. IE-NV contests those points.

[33] ECF No. 387.

[34] ECF No. 405 at 13; ECF No. 405-24. Defendants moved to exclude that undisclosed intercompany agreement in their replies. ECF No. 413 at 11–12; ECF No. 414 at 8–10. I permitted IE-NV to respond to their arguments in a surreply. ECF No. 424. IE-NV did so. ECF No. 425.

typos between its template, its plans, and the submitted plans—and that direct evidence of copying relieves its burden of showing substantially similar protectable elements.[35]

**Discussion**

The principal purpose of the summary-judgment procedure is to isolate and dispose of factually unsupported claims or defenses.[36] The moving party bears the initial responsibility of presenting the basis for its motion and identifying the portions of the record or affidavits that demonstrate the absence of a genuine issue of material fact.[37] If the moving party satisfies its burden with a properly supported motion, the burden then shifts to the opposing party to present specific facts that show a genuine issue for trial.[38]

Who bears the burden of proof on the factual issue in question is critical. When the party moving for summary judgment would bear the burden of proof at trial, "it must come forward with evidence [that] would entitle it to a directed verdict if the evidence went uncontroverted at trial."[39] Once the moving party establishes the absence of a genuine issue of fact on each issue material to its case, "the burden then moves to the opposing party, who must present significant probative evidence tending to support its claim or defense."[40] When instead the opposing party

---

[35] ECF No. 405 at 11–16. Both IE-NV and the defendants move for summary judgment on many of their state-law claims. But because I dismiss those claims for lack of jurisdiction, in part because they predominate over the federal issues in this case, I do not summarize the extensive arguments raised on those claims.

[36] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

[37] *Id.* at 323; *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001).

[38] Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Auvil v. CBS 60 Minutes*, 67 F.3d 816, 819 (9th Cir. 1995).

[39] *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (quoting *Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992) (cleaned up)).

[40] *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1558 (9th Cir. 1991) (cleaned up).

would have the burden of proof on a dispositive issue at trial, the moving party doesn't have to produce evidence to negate the opponent's claim; it merely has to point out the evidence that shows an absence of a genuine material factual issue.[41] The movant need only defeat one element of the claim to garner summary judgment on it because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."[42] "When simultaneous cross-motions for summary judgment on the same claim are before the court, the court must consider the appropriate evidentiary material identified and submitted in support of"—and against—"both motions before ruling on each of them."[43]

**A. IE-NV lacks standing to pursue the '906 registration.**

Both TWC and Prologis argue that IE-NV lacks statutory standing to pursue an infringement claim based on the '906 registration protecting the template.[44] "Under the Copyright Act, only the 'legal or beneficial owner of an exclusive right under a copyright' has standing to sue for infringement of that right."[45] The related but independent company IE-CA,

---

[41] *See, e.g.*, *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 885 (1990); *Celotex*, 477 U.S. at 323–24.

[42] *Celotex*, 477 U.S. at 322.

[43] *Tulalip Tribes of Wash. v. Washington*, 783 F.3d 1151, 1156 (9th Cir. 2015) (citing *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two,* 249 F.3d 1132, 1134 (9th Cir. 2001)).

[44] The defendants to the copyright claims filed numerous joinders to one another's motions. ECF Nos. 384, 388, 389, 391, 392, 406, 411. IE-NV objects to their use of joinders. But "[a]llowing one party to join another party's motion is a matter well within the district court's substantial case management discretion" and is appropriate if "the parties are so similarly situated that filing an independent motion would be redundant." *Crockford v. Clark Cnty. Dep't of Family Servs.*, 2025 WL 2301653, at *3 (D. Nev. Aug. 8, 2025) (quoting *Apothio, LLC v. Kern Cnty.*, 599 F. Supp. 3d 983, 1002 (E.D. Cal. 2022)). I find joinder appropriate here because the defendants to the copyright claims are similarly situated—their arguments, which largely turn on standing and the scope of copyright protection, raise issues common to all defendants. Denying their request would also result in redundant motion practice.

[45] *Righthaven LLC v. Hoehn*, 716 F.3d 1166, 1169 (9th Cir. 2013) (quoting 17 U.S.C. § 501(b)) and citing *Silvers v. Sony Pictures Ent., Inc.*, 402 F.3d 881, 890 (9th Cir. 2005)).

and not IE-NV, owns the '906 registration.[46] And while all parties agree that an exclusive license or assignment would confer standing, TWC and Prologis believed that no evidence showed that IE-CA had exclusively licensed or assigned its rights to IE-NV.[47] That is, until now. In its response briefs, IE-NV revealed for the first time a previously undisclosed 2024 intercompany agreement exclusively licensing the '906 registration, assigning any accrued causes of action for it, and backdating the license to 2004.[48] TWC and Prologis now contend that IE-NV's nondisclosure violated the Federal Rules of Civil Procedure, and an agreement like this cannot confer standing retroactively.[49]

***1. Rule 26 and 37 bar consideration of the intercompany agreement.***

Defendants insist that the undisclosed intercompany agreement violates Rule 26(a)(1)(A)(ii), which imposes, among other things, an ongoing obligation to disclose documents in a party's custody that it may use to support its case. Rule 37(c)(1) automatically excludes evidence not disclosed under Rule 26 unless "the parties' failure to disclose the required information is substantially justified or harmless."[50] "Several factors . . . guide the determination of whether substantial justification and harmlessness exist, including (1) prejudice or surprise to the party against whom the evidence is offered; (2) the ability of that party to cure the prejudice; (3) the likelihood of disruption of trial; and (4) bad faith or willfulness in not timely disclosing the evidence."[51] If the practical result of a preclusion sanction is dismissal, courts should

---

[46] ECF No. 383-2 at 748.

[47] ECF No. 385 at 11–12; ECF No. 391 at 2.

[48] ECF No. 405 at 12–13; ECF No. 407 at 14; ECF No. 405-24. In its surreply, IE-NV concedes that the intercompany agreement was not disclosed. ECF No. 425 at 3.

[49] ECF No. 413 at 11–12; ECF No. 414 at 8–10.

[50] *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001).

[51] *Liberty Ins. Corp. v. Brodeur*, 41 F.4th 1185, 1192 (9th Cir. 2022).

"identify willfulness, fault, or bad faith before dismissing a cause of action outright as a discovery sanction."[52]

Without a doubt, IE-NV should have disclosed the intercompany agreement under Rule 26(a)(1)(A)(ii). Proving the plaintiff's ownership of a valid copyright is a prima facie element of a copyright-infringement claim.[53] IE-NV argues that it thought the intercompany agreement was irrelevant or that standing wasn't at issue,[54] but IE-NV evidently knew of the agreement and understood its importance to this claim because the agreement explicitly references this pending litigation by name twice.[55] The very existence of this agreement—which closely tracks Ninth Circuit caselaw on standing and assignments—is also inexplicable without IE-NV being aware that standing might be an issue. So the court is satisfied that there is fault or willfulness on the part of IE-NV.[56]

And the late disclosure was not justified or harmless. TWC and Prologis point out that the belated disclosure stunted their ability to challenge, among other things, the document's authenticity, whether the arrangement was actually exclusive, and whether it was consistent with

---

[52] *Yeti by Molly*, 259 F.3d at 1106 (cleaned up); *see also R & R Sails, Inc. v. Ins. Co. of Penn.*, 673 F.3d 1240, 1247 (9th Cir. 2012).

[53] *DRK Photo v. McGraw-Hill Glob. Educ. Holdings*, LLC, 870 F.3d 978, 986 (9th Cir. 2017) ("[T]he plaintiff . . . has the burden of establishing a qualifying ownership interest both as a substantive element of the infringement claim . . . and as a necessary predicate for standing to bring the claim.").

[54] ECF No. 425 at 5.

[55] ECF No. 405-24 at 3.

[56] Such a finding is likely unnecessary here because the agreement doesn't foreclose IE-NV's copyright claim, which is based on nine other registrations. *Yeti by Molly*, 259 F.3d at 1106 (holding that a finding of willfulness, fault, or bad faith is unnecessary if the "sanction, although onerous, was less than a dismissal"); *Ambrosetti v. Oregon Catholic Press*, 151 F.4th 1211, 1219 (9th Cir. 2025) (quoting *Yeti by Molly*, 259 F.3d at 1106) ("[A] discovery sanction is not claim dispositive just because the sanction made it 'much more difficult, perhaps almost impossible' for a party to proceed with their claim or argument.").

other evidence.[57] IE-NV argues that the nondisclosure was harmless because defendants themselves lack standing to challenge the agreement, and IE-NV could've entered the agreement with IE-CA at any time.[58] But as explained *infra*, neither point is meritorious. So I find that this document should've been disclosed under Rule 26 and is properly excluded under Rule 37. IE-NV is thus precluded from relying on the intercompany agreement for standing.[59]

***2. The intercompany agreement did not confer standing in this situation.***

Even if IE-NV had timely disclosed the intercompany agreement, I am not convinced that this document would solve its standing problem. Congress "carefully circumscribed" the right to sue under the Copyright Act,[60] and the Ninth Circuit has refused to expand standing beyond what Congress circumscribed: "only the 'legal or beneficial owner of an exclusive right under a copyright' has standing to sue for infringement of that right"[61] "committed while he or she is the

---

[57] ECF No. 413 at 11–12; ECF No. 414 at 8–10 ("By withholding the only document on which IE now relies to establish standing, IE deprived Prologis of any opportunity to conduct discovery into the agreement's authenticity, scope, exclusivity, retroactivity, or consistency with IE's prior sworn positions."). Nor is this court the first one to conclude that this kind of nondisclosure wasn't harmless. In excluding late-disclosed agency agreements in a similar situation, the U.S. District Court for the Northern District of California explained in *Minden Pictures, Inc. v. Pearson Education, Inc.* that the defendants relied on what was disclosed to them under Rule 26 "as the sole basis for standing throughout the motion to dismiss phase, the entire course of discovery, and during the preparation of its motion for summary judgment." 929 F. Supp. 2d 962, 967 (N.D. Cal. 2013).

[58] ECF No. 425 at 3–5.

[59] *Minden Pictures*, 929 F. Supp. 2d at 967 (holding that preclusion was the appropriate remedy for failure to disclose agency agreements). The court also finds a lesser sanction to be inappropriate here.

[60] *Silvers*, 402 F.3d at 883–885.

[61] *Righthaven*, 716 F.3d at 1169 (quoting 17 U.S.C. § 501(b) and citing *Silvers*, 402 F.3d at 890); *Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137, 1143–44 (9th Cir. 2008) (quoting *Silvers*, 402 F.3d at 883–84) ("Copyright is wholly a 'creature of statute, and the only rights that exist under copyright law are those granted by statute.'"); *DRK Photo*, 870 F.3d at 988 (quoting *Silvers*, 402 F.3d at 885) ("Although we are certainly sympathetic to the practical challenges

owner of it."[62] And despite IE-NV's suggestion otherwise,[63] a defendant may challenge a plaintiff's ownership of the right for purposes of standing and "it is the plaintiff who has the burden of establishing a qualifying ownership interest both as a substantive element of the infringement claim . . . and as a necessary predicate for standing to bring the claim."[64]

---

attendant to policing infringement . . . those practical considerations cannot override the Copyright Act's 'carefully circumscribed' grant of the right to sue").

[62] 17 U.S.C. § 501(b).

[63] ECF No. 415 at 15–16; ECF No. 425 at 3–5.

[64] *DRK Photo*, 870 F.3d at 986. IE-NV points to several Ninth Circuit and district court cases predating *DRK Photo* to suggest that a third party may not challenge an assignment agreement. ECF No. 415 at 15–16. 17 U.S.C. § 204(a) requires that a transfer of copyright be in writing. The Ninth Circuit has previously suggested that "[w]hen there is no dispute between the copyright owner and transferee, it would be unusual and unwarranted to permit a third-party infringer to invoke § 204(a) to avoid suit for copyright infringement." *Jules Jordan Video, Inc. v. 144942 Canada Inc.*, 617 F.3d 1146, 1157 (9th Cir. 2010) (cleaned up); *Magnuson v. Video Yesteryear*, 85 F.3d 1424, 1428–29 (9th Cir. 1996).

IE-NV relies heavily on *Jules Jordan Video* in its surreply. ECF No. 425. That case arose in the unusual situation in which the adult actor Ashley Gasper and his "one-man shop" production company Jules Jordan Video (JJV) both sued for the infringement of their films, but the district court found that both lacked standing. *Jules Jordan Video*, 617 F.3d at 1150–52. The court reasoned that the films fell under the works-for-hire doctrine because JJV employed Gasper. *Id.* at 1152. Because JJV was the author under that doctrine, Gasper lacked standing; and JJV lacked standing because the copyright registration was in Gasper's name and thus invalid. *Id.* The Ninth Circuit reversed, concluding that the films were not works for hire. *Id.* at 1155–57. In dicta, the Ninth Circuit went on to note that Gasper and JJV (with Gasper as its sole president, shareholder, and employee) were essentially alter egos and the only parties with any possible claim to ownership. *Id.* at 1156. The court also noted that § 204(a) was "designed to resolve disputes between owners and transferees and to protect copyright holders from persons mistakenly or fraudulently claiming oral licenses or copyright ownership" and "it would be unusual and unwarranted to permit a third-party infringer to invoke § 204(a) to avoid suit for copyright infringement." *Id.* at 1157 (cleaned up). "Thus, had Gasper's testimony been sufficient to support an oral agreement between JJV and himself that any copyright technically owned by JJV was to be conveyed to him, defendants would have had no standing to complain that the agreement was never put in writing." *Id.*

But the subsequent *DRK Photo* panel clarified that those decisions—which largely involved memorializing undisputed, preexisting ownership transfers—don't foreclose challenges to ownership and standing based on the agreement's effect and whether the underlying ownership transfer actually occurred. *DRK Photo*, 870 F.3d at 986–87; *Great Bowery Inc v. Consequence Sound LLC*, 174 F.4th 1336, 1345 (11th Cir. 2026) ("But we do not understand [that language] to

Standing also generally must exist at the time of filing.[65] But IE-NV and IE-CA executed this agreement six years after this case started and made its effective date retroactive to 2004. While the Ninth Circuit has not treated the time-of-filing rule as ironclad,[66] neither has it yet addressed whether a nunc pro tunc licensing agreement can confer statutory standing under the Copyright Act.[67] Other courts have rejected such efforts to manufacture standing if the plaintiff otherwise would've lacked standing because it violates the principle that standing should exist at the time of filing.[68] But the Ninth Circuit and other courts have allowed post-litigation

---

mean that a copyright owner can, by consent, confer a licensee standing to sue for infringement without transferring an exclusive right. Rather, we believe the best reading of [that line of cases] is that a defendant cannot challenge the sufficiency of a writing under § 204(a)."). Defendants here don't challenge the formalities of the intercompany agreement in an undisputed ownership transfer but whether IE-CA and IE-NV had actually exclusively assigned the rights prior to the intercompany agreement and, if not, whether a retroactive agreement like the intercompany agreement can confer standing. ECF No. 414 at 8–9; ECF No. 413 at 11–12; *Great Bowery*, 174 F.4th at 1345 ("[E]ven though the licensor consented to the plaintiff's suit against the infringer (by signing the ratification), the plaintiff was not relieved of its burden of proving that it owned the relevant exclusive right at the time of the alleged infringement.").

[65] *Righthaven*, 716 F.3d at 1171.

[66] *Northstar Fin. Advisors Inc. v. Schwab Invs.*, 779 F.3d 1036, 1044–1046 (9th Cir. 2015).

[67] *Minden Pictures, Inc. v. John Wiley & Sons, Inc.*, 795 F.3d 997, 1002 (9th Cir. 2015) ("[Plaintiff] argues that the district court erred in declining to consider the 2013 [assignment] [a]greements on the ground that they were executed after [the plaintiff] filed its complaint . . . we do not reach [that] argument[]."). TWC argues that a nunc pro tunc assignment agreement would impermissibly contract around 17 U.S.C § 501(b)'s limitation that standing is limited to infringement "committed while he or she is the owner of [the rights]."

[68] *See, e.g.*, *Righthaven*, 716 F.3d at 1171 (declining to reach the issue but noting that "[i]n general, jurisdiction is based on facts that exist at the time of filing. . . . So far, permitting standing based on a property interest acquired after filing is not [an exception to this general principle]."); *Minden Pictures*, 795 F.3d at 1002 (declining to reach the issue but noting that the district court "held that [the plaintiff] could not rely on the later-executed 2013 Assignments" because they were executed after the complaint was filed); *Studio S Imports, LLC v. Deutsch Imports, LLC*, 2021 WL 3598571, at *2 (C.D. Cal. June 21, 2021) ("[A] writing signed after litigation began cannot confer standing unless it merely confirms an earlier agreement to grant a copyright ownership right to the plaintiff.").

agreements to confer standing for copyright claims[69] when memorializing a pre-existing oral agreement,[70] correcting an error,[71] or if the situation is otherwise non-prejudicial to the defendants.[72]

Assuming that post-litigation agreements are enforceable in limited situations, IE-NV has not shown that this situation warrants giving it effect. "For a writing to 'validate' a past transfer, the past transfer must have actually occurred."[73] A plaintiff must corroborate a prior transfer with evidence even if the transfer was between two corporate entities acting through the same person[74] or, as IE-NV puts it, the same "man behind the curtain" orchestrated the transfer.[75] But IE-NV didn't show that the agreement merely corrected an error or memorialized some prior oral exclusive-licensing arrangement. Besides the agreement itself, IE-NV's briefing doesn't point to any testimony, declaration, or document outright stating that this agreement confirmed a prior *exclusive*-licensing agreement;[76] IE-NV rather states that the agreement's purpose was

---

[69] *See* Nimmer on Copyright § 12.02[C]; *Magnuson*, 85 F.3d at 1428 ("[C]ase law holds that under some circumstances a prior oral grant that is confirmed by a later writing becomes valid as of the time of the oral grant, even if the writing is subsequent to the initiation of litigation on the copyright infringement.").

[70] *Magnuson*, 85 F.3d at 1429 ("[W]e find that the memorandum of conveyance satisfied the writing requirement of the 1909 Copyright Act, even though it was not executed at the time of the transfer."); *Nirvana L.L.C. v. Marc Jacobs Int'l L.L.C.*, 2023 WL 11821416, at *13–14 (C.D. Cal. Dec. 21, 2023).

[71] *See Jules Jordan Video*, 617 F.3d at 1156.

[72] *See, e.g.*, *Infodek, Inc. v. Meredith-Webb Printing Co.*, 830 F. Supp. 614, 620 (N.D. Ga. 1993); *Oracle Corp. v. SAP AG*, 734 F. Supp. 2d 956, 961 (N.D. Cal. 2010); Nimmer on Copyright § 12.02[C] n.55 ("It has been held that, even after commencement of the action, an explicit assignment suffices, provided that such assignment occurs before the trial itself and defendant suffers no prejudice.").

[73] *Barefoot Architect, Inc. v. Bunge*, 632 F.3d 822, 830 (3d Cir. 2011).

[74] *See id.* at 831–32.

[75] ECF No. 425 at 4.

[76] A *non*exclusive license confers no standing. *Sybersound Recs.*, 517 F.3d at 1144–46.

"specifically to confer on IE-NV the ability to enforce the copyrights" in this litigation.[77] While the intercompany agreement itself purports to memorialize an agreement dating from 2004,[78] courts have recognized that "the same document" cannot "both prove[] that an oral transfer occurred and g[i]ve legal effect to that otherwise unenforceable promise."[79]

Apart from the agreement itself, IE-NV essentially askes this court to infer an exclusive license from IE-CA and IE-NV's close relationship and IE-NV's prior, exclusive use of the template in Nevada. While some courts have speculated that a "copyright transfer [may] be implied from conduct and then later validated in writing,"[80] the issue with that evidence though is that "the difference between an exclusive and nonexclusive license can be 'blurry at best.'"[81] "[T]he essence of an 'exclusive' license under the Act is that 'the copyright holder permits the licensee to use the protected material for a specific use and further promises that the same permission will not be given to others.'"[82] But the record doesn't support an exclusive arrangement or that IE-NV was promised exclusivity. For example, IES, which is related to but independent from IE-NV and IE-CA, used and had access to the template well after this

---

[77] ECF No. 405 at 13.

[78] ECF No. 405-24 at 2.

[79] *Barefoot Architect*, 632 F.3d at 832 ("None of those courts confronted a case in which it was argued that the same document both proved that an oral transfer occurred and gave legal effect to that otherwise unenforceable promise. We do not think that a 'note or memorandum of transfer' can simultaneously serve each of these purposes. If it could, a distantly post-hoc writing would be capable of rendering enforceable a (possibly fictional) 'transfer' that purportedly took place years or decades earlier but for which there is no independent evidence.").

[80] *Id.* at 833 n.4.

[81] 3 Nimmer on Copyright § 12.02[B][3] (quoting *HyperQuest, Inc. v. N'Site Sols., Inc.*, 632 F.3d 377, 385 (7th Cir. 2011)).

[82] *Minden Pictures*, 795 F.3d at 1005 (quoting *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 775 (7th Cir. 1996)).

supposedly exclusive license to IE-NV.[83] Without more, I cannot conclude that, or find a genuine dispute as to whether, the intercompany agreement merely confirmed a preexisting exclusive-licensing arrangement. And those without an exclusive right lack standing "even if an infringer is operating without a license to the detriment of a nonexclusive licensee who has paid full value for his license."[84] So I hold that the intercompany agreement did not confer standing, and IE-NV did not meet its burden of proving its standing.

The practical result, then, is that IE-NV cannot pursue infringement of the '906 registration in its copyright claims and recover for the expressions that stem from the general template—such as the plan's symbols, the project notes, the title sheet layout, etc. "The author of a derivative work" also "cannot obtain a copyright interest in the source work by registering a derivative work."[85] So "[c]opyright in a derivative . . . work covers only those elements contained therein that are original with the copyright claimant,"[86] and IE-NV thus cannot use its plan registrations to assert its rights under the '906 registration

---

[83] ECF No. 383-2 at 344–345 (95:6–9, 99:22–101:4); *id.* at 398-400 (293:10–17, 297:5–298:24, 301:11–14, 302:15–304:11) (stating that IES Nevada prepared drawings that used the same or similar symbols as the template); ECF No. 396-40 at 10 (29:17–25). IE-NV argues that only IE-CA and IE-NV used the template. In support, IE-NV points to Mark Beverly, Brandon Beverly, and Gus Baquerizo's depositions. ECF No. 407 at 5. However, Mark Beverly stated that he didn't recall if IES used the template, but Brandon Beverly might've prepared drawings for IES. ECF No. 383-2 at 345 (100:18–101:4), 372 (208:2–5). Baquerizo stated that he didn't think he could recall any use by IES. *Id.* at 239 (267:5–8) ("Q. But you don't recall IE Systems ever using this template? A. No, I don't think so . . . ."). He also stated he didn't do any design work for IES, but Brandon Beverly might have. *Id.* (268:4–9). In his deposition, Brandon Beverly affirmatively stated that IES did use the template. ECF No. 396-40 at 10 (29:17–25). IE-NV also offhandedly states in its brief that "IE Systems was not an authorized Template user." ECF No. 407 at 5. But the deposition testimony that it cites in support does not state that.

[84] *Sybersound Recs.*, 517 F.3d at 1144.

[85] *Unicolors, Inc. v. Urban Outfitters, Inc.*, 853 F.3d 980, 990 (9th Cir. 2017).

[86] 1 Nimmer on Copyright § 3.04[A].

**B. IE-NV has not met its summary-judgment burden to show infringement of the electrical plans.**

To prove copyright infringement on its remaining registrations, IE-NV must show that it owned a valid copyright in the plans and that the defendants copied those plans.[87] Copying requires both factual copying (that the work was actually copied) and legal copying (that the copying was unlawful).[88] "Factual copying [alone] fails to prove infringement"[89] because "copyright law does not forbid all copying."[90] Legal copying or "unlawful appropriation" requires the court to perform the extrinsic test—the court must compare the objective similarities in the two works' specific protected elements and conclude that defendants "cop[ied] enough of the plaintiff's expression . . . to render the two works 'substantially similar.'"[91] The factfinder then performs the intrinsic test by considering the "similarity of expression from the standpoint of the ordinary reasonable observer, with no expert assistance."[92]

---

[87] *Skidmore as Tr. for Randy Craig Wolfe Tr. v. Led Zeppelin*, 952 F.3d 1051, 1064 (9th Cir. 2020).

[88] *Id.* ("The second prong of the infringement analysis contains two separate components: 'copying' and 'unlawful appropriation' . . . . Although these requirements are too often referred to in shorthand lingo as the need to prove 'substantial similarity,' they are distinct concepts."). Factual copying is sometimes called "copying." Legal copying is sometimes called "illicit copying" or "unlawful appropriation." Legal and factual copying are the terms that Professor Nimmer uses. 4 Nimmer on Copyright § 13D.02. I use those terms here for clarity.

[89] 4 Nimmer on Copyright § 13D.02[B][4]; *Bell v. Wilmott Storage Servs., LLC*, 12 F.4th 1065, 1074 (9th Cir. 2021) (quoting 4 Nimmer on Copyright § 13.03[A]) ("[E]ven [if] the fact of copying is conceded, no legal consequences will follow from that fact unless the copying is substantial.").

[90] *Rentmeester v. Nike, Inc.*, 883 F.3d 1111, 1117 (9th Cir. 2018), *overruled on other grounds by Skidmore*, 952 F.3d 1051.

[91] *Id.* (quoting *Mattel, Inc. v. MGA Entertainment, Inc.*, 616 F.3d 904, 913–14 (9th Cir. 2010)).

[92] *Apple Comput., Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1442 (9th Cir. 1994).

### *1. Doctrinal limitations afford IE-NV's electrical plans "thin" copyright protection.*

Even assuming that IE-NV owned the copyright in the plans and factual copying occurred,[93] IE-NV has not met its burden on the extrinsic test. The court performs the extrinsic test by first filtering out and disregarding the unprotectible elements in a work.[94] It then considers the objective similarities in the two works and their remaining protectable elements.[95] The court may consider expert testimony in this analysis and may decide the extrinsic test as a matter of law.[96] "Summary judgment for [the defendants] is proper if the similarity relates solely to noncopyrightable material."[97]

Several related doctrines and affirmative defenses inform this court's filtration inquiry. First, copyright law guards against "substantial similarity in *protectable* expression, not . . . in facts, ideas, or concepts," and a copier will "incur[] no liability if he copies only the 'ideas' or 'concepts' used in the plaintiff's work."[98] Second, copyright law is not a workaround of patent law; "[t]he law denies protection to functional features to prevent the monopolization of useful

---

[93] 4 Nimmer on Copyright § 13D.25 ("Whether or not those errors are intentionally placed in plaintiff's work, courts have regarded the existence of common errors in two similar works as the strongest evidence of copying as a factual matter.").

[94] *Yonay v. Paramount Pictures Corp.,* 163 F.4th 685, 692 (9th Cir. 2026); *Rentmeester*, 883 F.3d at 1118 ("Before that comparison can be made, the court must 'filter out' the unprotectable elements of the plaintiff's work—primarily ideas and concepts, material in the public domain, and scènes à faire." (cleaned up)).

[95] *Id.*

[96] *Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1164 (9th Cir. 1977), *overruled on other grounds by Skidmore*, 952 F.3d 1051; *Gray v. Hudson*, 28 F.4th 87, 97 (9th Cir. 2022) ("[T]he extrinsic test requires us as a court to ensure that whatever objective similarities the evidence establishes between two works are legally sufficient to serve as the basis of a copyright infringement claim regardless of the jury's views.").

[97] 4 Nimmer on Copyright § 13D.22[A].

[98] *Yonay*, 163 F.4th at 692 (cleaned up).

technical advances that do not qualify for patents."[99] Third, "[u]nder the merger doctrine, courts will not protect a copyrighted work from infringement if the idea underlying the copyrighted work can be expressed in only one way" as the "idea and expression 'merge.'"[100] Fourth, the doctrine of scènes à faire[101] precludes copyright protection for "infringement if the expression embodied in the work necessarily flows from a commonplace idea"[102] or the elements were "dictated by external factors."[103]

These doctrines and IE-NV's inability to pursue the template's copyright whittle the protectable elements in its plans down to a nub. Constraints such as pre-existing architectural plans, code requirements, site plans, and industry standards significantly limit the range of expression in these plans.[104] Thus, assuming that there is some protectable element in IE-NV's

---

[99] *Fabrica Inc. v. El Dorado Corp.*, 697 F.2d 890, 894 (9th Cir. 1983).

[100] *Ets-Hokin v. Skyy Spirits, Inc.*, 225 F.3d 1068, 1082 (9th Cir. 2000); *Attia v. Soc'y of N.Y. Hosp.*, 201 F.3d 50, 55 (2d Cir. 1999) ("The problem of distinguishing an idea from its expression is particularly acute when the work of 'authorship' is of a functional nature, as is a plan for the accomplishment of an architectural or engineering project. As a generalization, to the extent that such plans include generalized notions of where to place functional elements, how to route the flow of traffic, and what methods of construction and principles of engineering to rely on, these are 'ideas' that may be taken and utilized by a successor without violating the copyright of the original 'author' or designer.").

[101] "Vaguely French for scenes which must be done." *Satava v. Lowry*, 323 F.3d 805, 810 n.3 (9th Cir. 2003) (cleaned up).

[102] *Ets-Hokin*, 225 F.3d at 1082.

[103] *Gates Rubber Co. v. Bando Chem. Indus., Ltd.*, 9 F.3d 823, 838 (10th Cir. 1993).

[104] *See, e.g.*, ECF No. 383-2 at 185 ("I would receive the AutoCAD backgrounds from the architect, and the backgrounds are a building form, rooms, whatever was in it. Then I would put lights to them and basically just fully design it by adding whatever the mechanical contractors or mechanical engineer is going to do, air conditioning, plumbing, coordinate with them, and I would engineer the drawings."); ECF No. 383-3 at 171 (68:14–20) ("There is an engineering process that is standard for engineering, but I don't know that [the Prologis projects] [were] any different than what any other engineer would be required to provide."); *id.* at 136 (45:3–46:22) (noting that plans complied with National Electrical Code); *id.* at 38–63 (noting that architectural revisions affected some plan designs).

precise selection, arrangement, or layout, [105] it would be entitled to "thin" or "very thin" copyright protection.[106] "Broad" protection would risk conferring a monopoly on the unprotectable idea of electrically wiring these properties generally.

***2. IE-NV has not identified protectable elements or shown substantial similarity.***

The court finds summary judgment appropriate here. "Summary judgment is the 'put up or shut up' moment in a lawsuit."[107] To survive summary judgment on an infringement claim and the extrinsic test, "the plaintiff [must] identify concrete elements based on objective criteria."[108] And due to "thin" copyright protection, those concrete elements must reflect "virtual identity" between the works.[109]

---

[105] *Satava*, 323 F.3d at 811 ("[A] combination of unprotectable elements is eligible for copyright protection only if those elements are numerous enough and their selection and arrangement original enough that their combination constitutes an original work of authorship.").

[106] *Ets-Hokin v. Skyy Spirits, Inc.*, 323 F.3d 763, 766 (9th Cir. 2003); *Zalewski v. Cicero Builder Dev. Inc.*, 754 F.3d 95, 107 (2d Cir. 2014) (holding copyright holder was entitled to "very thin" protection in his architectural work because he made "no attempt to distinguish those aspects of his designs that were original to him from those dictated by the form in which he worked").

[107] *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (quoting *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir.2003)).

[108] *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 485 (9th Cir. 2000), *overruled on other grounds by Skidmore*, 952 F.3d 1051; *Cavalier v. Random House, Inc.*, 297 F.3d 815, 824 (9th Cir. 2002); *Rice v. Fox Broad. Co.*, 330 F.3d 1170, 1174 (9th Cir. 2003), *overruled on other grounds by Skidmore*, 952 F.3d 1051 (quoting *Kouf v. Walt Disney Pictures & Television*, 16 F.3d 1042, 1045 (9th Cir. 1994)) ("[A] plaintiff who cannot satisfy the extrinsic test necessarily loses on summary judgment . . . ."); *Johannsongs-Publ'g Ltd. v. Lovland*, 2020 WL 2315805, at *7 (C.D. Cal. Apr. 3, 2020), *aff'd,* 2021 WL 5564626 (9th Cir. Nov. 29, 2021) (quoting *Skidmore*, 952 F.3d at 1075) ("A claim based on a selection and arrangement of unprotected elements requires a plaintiff 'to explain how these elements are particularly selected and arranged,' otherwise the claim 'amounts to nothing more than trying to copyright commonplace elements.'").

[109] *Ets-Hokin*, 323 F.3d at 766; 4 Nimmer on Copyright § 13D.32.

IE-NV, however, declined several opportunities to perform the extrinsic test in its briefing.[110] It does not specify what particular elements of these plans are protectable in light of the merger and scènes à faire doctrines but rather asserts that direct copying nonetheless warrants a finding of infringement.[111] While exact copying would allow the court to infer that whatever was "thinly" protected in these works was copied,[112] the issue with that argument is that the plans and the purportedly copied plans are not identical. So the court—which has no background in electrical engineering—is left only to speculate as to what elements are protectable and similar, which alone warrants summary judgment.

What I can reasonably glean from the record doesn't create a triable issue. As a threshold matter, IE-NV did not include three of the purportedly infringed plans with its motion. Of the six plans it did include,[113] some of the plans are indeed similar when placed side by side with the

---

[110] *See* ECF No. 387 at 28 ("[A]ny assertion by the Defendants regarding substantial similarity of protectable elements has no bearing on this case."). IE-NV conflates "substantial similarity," which the court uses to infer factual copying, with the (unfortunately) identically named "substantial similarity," which the court uses to determine whether that copying was unlawful. *See* ECF No. 415 at 19; *Rentmeester*, 883 F.3d at 1117 ("Unfortunately, [the Ninth Circuit has] used the same term—'substantial similarity'—to describe both the degree of similarity relevant to proof of copying and the degree of similarity necessary to establish unlawful appropriation. The term means different things in those two contexts."). But "after proving that the defendant's work is the product of copying rather than independent creation, the plaintiff must still show copying of protected expression that amounts to unlawful appropriation . . . . The showing of substantial similarity necessary to prove unlawful appropriation does not vary with the degree of access the plaintiff has shown." *Id.* at 1124.

[111] *See* ECF No. 415 at 19–20.

[112] *See, e.g.*, *Bell*, 12 F.4th at 1074 (quoting 4 Nimmer on Copyright § 13.03[A][1]) ("As Professor Nimmer explains, '[i]f such duplication is literal or verbatim, then clearly substantial similarity exists.'"); *Eales v. Envtl. Lifestyles, Inc.*, 958 F.2d 876, 879–880 (9th Cir. 1992), *abrogated on other grounds by Hunt v. Pasternack*, 179 F.3d 683 (9th Cir. 1999).

[113] TWC also asserts that IE-NV did not include the deposit copies of the plans submitted to the copyright office and the best-evidence rule bars admission of these supposed copies. Because I determine that IE-NV did not meet its burden even with the copies it provided, I do not reach TWC's best-evidence-rule argument.

purportedly copied plans. But TWC's expert parsed each plan sheet-by-sheet and found that the exact layout and arrangement differed between IE-NV's plans and the submitted plans.[114] While there appears to be some copying, the expert opines that each plan differs from IE-NV's plans in the layout and exact location of equipment and devices, lighting designs, engineering, and circuit assignments.[115] The defendants' plans also contained additional sheets, architectural revisions, or items that have been removed.[116] So the court cannot simply infer that whatever was protectable was copied.

Nor is it clear that what was copied is protectable. TWC's expert notes that the similarities can be attributed to industry-standard scènes à faire and that for each plan the "layout of . . . [the] plans on Interior Electric's drawings is consistent with industry standard placement of similar information."[117] And for its four projects, a Prologis employee responsible for overseeing those projects stated that "99 percent of the systems, the dimensions, and whatnot are industry standard."[118] Another employee involved in overseeing the projects described the plans as "very vanilla, generic designs,"[119] "rinse and repeat," and "[s]omething that anyone can produce."[120] That employee also elaborated that the plans are essentially an "electrical room with a box and there are circuits and things. There is an engineering process that is standard for engineering, but I don't know that ours was any different than what any other engineer would be

---

[114] ECF No. 383-3 at 38–63.

[115] *Id.*

[116] *Id.*

[117] *Id.*

[118] *Id.* at 241 (76:10–11).

[119] *Id.* at 171 (68:11–13).

[120] *Id.* at 188 (136:22–137:14).

required to provide."[121] And many of the copied elements from IE-NV's plans reflect unprotectable expressions driven by functionality.[122]

IE-NV's evidence fails to identify protectable elements or create some triable issue. IE-NV's expert primarily focuses on the title sheet of each of the plans and certain symbols from the template.[123] He notes that the title sheets are largely identical between IE-NV's plans and the supposedly copied plans.[124] He also opines that the symbols are unique to IE-NV and were copied.[125] But those elements derive from the template and the '906 registration and IE-NV lacks standing to pursue them.[126] Although IE-NV's expert states in passing in his deposition that every drafter is a "little unique" in arranging his layout and he believes that some plans copied over that unique expression, that observation doesn't aid the court in the extrinsic test because he did not identify what specifically was unique in IE-NV's layouts and what was copied.[127] He also acknowledges that several of defendants' plans were altered and described some as "totally different."[128] So I find that IE-NV failed to carry its burden on its copyright

[121] *Id.* at 171 (68:14–20).

[122] *See, e.g.*, ECF No. 387-58 at 3. For example, one phrase copied over is that "main electrical disconnect placecard shall be placed on the main electrical service equipment based on 2011 NEC 230.70." *Id.* That element seems entirely driven by the NEC.

[123] ECF No. 383-3 at 143–144 (73:4–74:7).

[124] *See id.* at 144 (75:23–76:2).

[125] *Id.* at 137 (46:23–47:7).

[126] *See* ECF No. 387-76 (IE template); *Unicolors*, 853 F.3d at 990 ("[T]he copyright protections for a derivative work are limited to the changes and contributions made by the derivative work's author and are distinct from the copyright protections for the source work.").

[127] ECF No. 383-3 at 145–46 (80:4–9, 81:18–82:6, 85:6–18).

[128] *Id.* at 139 (57:7–24), 145 (79:4–10).

claims[129] or to create a genuine dispute, and I grant summary judgment on the claims of copyright infringement, contributory infringement, and vicarious infringement.[130]

**C. The court grants defendants summary judgment on the Digital Millennium Copyright Act claim.**

Intertwined with its copyright arguments, TWC, along with the defendants joining its motion, request that I enter summary judgment on IE-NV's claim for removal or alteration of copyright-management information under the Digital Millennium Copyright Act (DMCA). TWC argues that it had nothing to do with the removal of that information.[131] IE-NV does not directly engage the defendants' argument but notes elsewhere in its briefing that it believes that TWC emailed Baquerizo to remove the copyright-management information.[132]

Based on the complaint's allegations, IE-NV appears to bring a claim under only § 1202(b)(1) of the DMCA,[133] which prohibits those without authority from (1) intentionally removing or altering any copyright-management information while (2) "knowing, or . . . having reasonable grounds to know, that it will induce, enable, facilitate, or conceal" infringement. Even assuming that Baquerizo removed copyright-management information and secondary

---

[129] *Martins v. Josephson*, 2023 WL 6282740, at *4 (S.D. Cal. Sept. 26, 2023) (quoting *Three Boys*, 212 F.3d at 485) ("As an initial matter, Plaintiff has not identified any 'concrete elements based on objective criteria' to meet the extrinsic test . . . This alone subjects his claims to dismissal.").

[130] It's unclear if IE-NV also argues that a TWC employee emailing a copy of an IE-NV plan to Baquerizo after his termination separately constituted infringement (or if it offers it only as evidence of factual copying). *See* ECF No. 387 at 29. Regardless, this theory did not appear in its complaint and IE-NV pled no allegations related to it. *See* ECF No. 188. A plaintiff cannot raise a new theory of liability in its summary-judgment briefing that did not appear in its complaint. *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1294 (9th Cir. 2000).

[131] ECF No. 383 at 19–20.

[132] ECF No. 405 at 14.

[133] *See* ECF No. 188 at 56–57.

liability exists for DMCA violations,[134] "to satisfy the knowledge requirement," "the plaintiff must provide evidence from which one can infer that future infringement is likely, albeit not certain, to occur as a result of the removal or alteration of [copyright-management information]."[135]

But for the reasons defendants set forth in their copyright arguments, there were not reasonable grounds for defendants to suspect that future infringement would occur. IE-NV has not shown that defendants' plans were infringing, the copyright protection afforded to electrical plans is "thin," and defendants modified the plans.[136] So I grant defendants summary judgment on this claim.

**D. The court lacks subject matter jurisdiction over the remaining claims.**

With the Copyright Act claims excised from this case, the court is left with more than twenty complex and novel state-law claims or counterclaims primarily centered around two Nevada corporations and several Nevada residents. "It is axiomatic that federal courts are courts of limited jurisdiction"[137] and that "the court is under a continuing duty to dismiss an action

---

[134] Whether secondary liability is available for a DMCA claim is unresolved and not necessarily supported by the statute's text. 4 Nimmer on Copyright § 12A.10[B][3] ("What if someone does not directly violate the statutory provisions regarding copyright management information, but assists another to do so—does vicarious liability attach here? On principle, it would seem that the statute forecloses that result.").

[135] *Stevens v. Corelogic, Inc.*, 899 F.3d 666, 675 (9th Cir. 2018).

[136] Relatedly, Professor Nimmer also believes that, "[i]n addition, to be actionable, the removal must be from a work that is at least substantially similar to the copyrighted work in question." 4 Nimmer on Copyright § 12A.10[C][1]. Several courts have gone further and held that the original work containing the copyright-management information and the work it was removed from must be identical. *See, e.g.*, *Biltform Architecture Group, Inc. v. Inv. Dev. Mgmt., LLC*, 2023 WL 12140369, at *3 (D. Ariz. Oct. 27, 2023) ("[C]ourts have held that to have a DMCA claim a plaintiff must allege that the copyrighted work and the copied work are identical."). That issue is currently pending before the Ninth Circuit. *Doe v. Github, Inc.*, 24-7700 (9th Cir.).

[137] *Polo v. Innoventions Int'l, LLC*, 833 F.3d 1193, 1195 (9th Cir. 2016).

whenever it appears that the court lacks jurisdiction."[138] And this court lacks jurisdiction over state-law disputes between nondiverse parties absent this court exercising supplemental jurisdiction.[139]

A federal district court retains supplemental jurisdiction "over all other claims that are so related" to the claims over which the court has original jurisdiction "that they form part of the same case or controversy under Article III of the United States Constitution."[140] But 28 U.S.C. § 1367(c) permits the court to "decline to exercise supplemental jurisdiction over a claim" if "(1) the claim raises a novel or complex issue of state law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction."[141] "When deciding whether to exercise supplemental jurisdiction" under this statute, "a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity."[142]

The factors strongly favor declining jurisdiction over what's left of this case. "In the usual case in which all federal-law claims are eliminated before trial, the balance of factors will point toward declining to exercise jurisdiction over the remaining state-law claims."[143] This is

---

[138] *Augustine v. United States*, 704 F.2d 1074, 1077 (9th Cir. 1983).

[139] *See* 28 U.S.C. §§ 1332, 1367; *Carden v. Arkoma Assocs.*, 494 U.S. 185, 187 (1990) ("[W]e have interpreted the diversity statute to require 'complete diversity' of citizenship.").

[140] 28 U.S.C. § 1367(a).

[141] 28 U.S.C. § 1367(c) (cleaned up).

[142] *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997) (cleaned up).

[143] *Acri v. Varian Assocs., Inc.*, 114 F.3d 999, 1001 (9th Cir. 1997) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)) (cleaned up).

true here. Complex state-law claims also substantially predominate over any federal issues. One of IE-NV's primary arguments is that certain Nevada statutes void contractual provisions on public-policy grounds. Such arguments are best addressed by the Nevada state courts. The only remaining federal issue in this case is the defendants' federal-preemption defense, which does not itself confer jurisdiction.[144] So I find under § 1367(c) that supplemental jurisdiction should not be exercised, and I decline to exercise supplemental jurisdiction over these claims and dismiss them under Rule 12(b)(1).

**Conclusion**

IT IS THEREFORE ORDERED that Defendants T.W.C. Construction, Inc, Prologis, L.P., BAMM Electric, LLC, and Gustavo Baquerizo's motions for partial summary judgment **[ECF Nos. 383, 385, 388] are GRANTED** on the federal claims in favors of Defendants T.W.C. Construction, Inc, Prologis, L.P., BAMM Electric, LLC, Clifford Anderson, Power On Electric Company, and Gustavo Baquerizo. Interior Electric Inc. Nevada's motion for summary judgment **[ECF No. 387]** is **DENIED.** The Clerk of Court is also directed to **ENTER JUDGMENT** against plaintiff IE-NV and in favor of:

- TWC, Baquerizo, Anderson, Power On, and BAMM on plaintiff's claim for direct copyright infringement;
- Prologis, TWC, and Baquerizo on plaintiff's claim for contributory copyright infringement;
- Prologis, TWC, and Baquerizo on plaintiff's claim for vicarious copyright infringement; and

[144] *Hunter v. United Van Lines*, 746 F.2d 635, 652 (9th Cir. 1984) ("The presence of a federal preemption defense cannot support federal jurisdiction.").

- TWC, Baquerizo, Anderson, Power On, and BAMM on plaintiff's claim for DMCA violations.

All remaining claims are **DISMISSED without prejudice to their refiling in state court** under 28 U.S.C. § 1367; the pending discovery stipulation **[ECF No. 423]** is **DENIED** without prejudice as moot; and the Clerk of Court is directed to **CLOSE THIS CASE**.

U.S. District Judge Jennifer A. Dorsey
August 13, 2026